[No. 40507-1-I.   Division One.   October 18, 1999.]
THE STATE OF WASHINGTON, *Respondent*, v. DARREL D. FISH, *Appellant*.

*David L. Donnan* of *Washington Appellate Project*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Ann Marie Summers, Deputy*, for respondent.

Ellington, J. — Darrell Fish fired three shots into a car filled with seven teenagers. Angela Garcia was killed. At his murder trial, Fish claimed he acted in self-defense because he thought someone in the car was about to fire a gun at him. We hold that Fish was not twice put in jeopardy for his offense, and we find no error in the exclusion of certain evidence, no basis for an excusable homicide instruction, and that any prosecutorial misconduct was harmless. We affirm.

## Facts

On the evening of March 2, 1996, Angela Garcia, her boyfriend Fred James, her younger brother Sean Garcia, and their friends John "Izzy" Grady and Betsy Coate drove from Onalaska to Seattle to visit Dean Baxter, who was a friend of James. They drove to Baxter's apartment, where they drank beer and socialized. Another friend, Silver Jacobson, was there as well. The entire group then decided to drive around in James' car.

James drove; Baxter sat in the passenger seat, and Angela sat between them. Coate, Grady, Jacobson, and Sean Garcia all sat in the back seat. While James drove, Baxter and Jacobson hung out the windows, throwing beer cans at passing cars and yelling obscenities and other epithets at passersby.

Baxter carried a pistol with him in the car. He had shown the gun to the group before they started driving around and told them the gun had no firing pin or clip.

As the group drove across the Ballard bridge, Baxter and Jacobson asked to be let out of the car so they could get or steal more beer (the recollections among the witnesses varied). After James drove around the block, Baxter and Jacobson jumped in the car, and Baxter said they had seen someone with a gun. Baxter then struck his gun against the windshield of the car, causing it to crack. James told him to put the gun away.

The group reached a stoplight at the intersection of Mar-

ket Street and 15th Avenue NW, where a blue Datsun driven by the defendant, Darrell Fish, pulled up next to them. With Fish were Anthony Asaro and Shawlee Westmoreland, who had been drinking earlier in the day. Fish was sober. Because the Datsun had only two seats, Westmoreland was forced to sit on the floor of the car in front of Asaro.

While stopped at the intersection, Baxter and Jacobson yelled various threats and epithets at Fish's car, including "We're going to kill you." Neither Fish nor Asaro yelled back. As the cars continued along Market Street, Baxter and Jacobson continued to yell at the Datsun and hang out of the car windows. Fish commented that he thought the people in the car had a gun. Asaro said he saw no gun, but that Baxter "acted like he had a gun" while hanging out the window. At one point, James' car swerved into the Datsun's lane, and Fish moved to avoid them.

Both vehicles pulled away from each other. James then pulled into the parking lot of a fast food restaurant, mistakenly thinking it was the parking lot for the convenience store where they planned to buy more beer. Realizing his mistake, he pulled out onto the street. At that point, Fish's car was coming down the same street from the opposite direction. Fish claimed that as the two cars approached each other, he saw what he believed to be a gun pointed at the Datsun. Fish then reached into his waistband for his own gun, fired three to four shots at James' car as the cars passed each other, and continued driving. When Fish fired, he was approximately four yards from James' car.

Angela Garcia was shot in the head and died. Baxter was also shot.

Fish testified that he did not aim the gun, nor did he intend to hit anything. He stated, "I didn't have any thought as to where I wanted [the bullets] to go. I just wanted to, I just wanted to stop them from shooting us."

Fish fled to Texas. He disposed of the gun in the Rio Grande River. After several weeks, he contacted a Seattle

attorney to make arrangements to return to Seattle and surrender himself to the authorities.

Fish was charged in the alternative with first and second degree murder. The first jury was unable to reach a verdict. After a second trial, the jury found Fish guilty on both charges, which were merged for sentencing purposes.

## Discussion

### Double Jeopardy

■■ Fish contends that the first jury was prematurely dismissed, so retrial was barred by the double jeopardy clause of the United States and Washington constitutions.[1] When a court declares a mistrial due to jury deadlock, the decision should be accorded great deference by the reviewing court.[2] When a jury acknowledges through its foreman, and on its own accord, that it is hopelessly deadlocked, there is a factual basis sufficient to constitute the "extraordinary and striking" circumstance necessary to justify discharge.[3] Some of the factors a judge should consider in determining whether to discharge the jury include the length of deliberations in light of the length of the trial, and the volume and complexity of the issues.[4]

In *State v. Jones*, the Supreme Court found a mistrial unjustified when, after a four-day trial, the jurors gave no indication they were having problems reaching a verdict, one of the issues was particularly difficult, the court did not sufficiently inquire whether the jurors were genuinely deadlocked, and the court did not consider any alterna-

---

[1]*See* U.S. Const. amend. V; Wash. Const. art. I, § 9.

[2]*State v. Jones*, 97 Wn.2d 159, 163, 641 P.2d 708 (1982).

[3]*Id.* at 164.

[4]*State v. Kirk*, 64 Wn. App. 788, 793, 828 P.2d 1128 (1992) (citing *Jones*, 97 Wn.2d at 164).

tives to discharge.[5] By contrast, in *State v. Dykstra*,[6] the trial court considered the apparent breakdown of the deliberative process, the lack of progress in reaching a verdict, and an acknowledgment by the foreman that the jury could not reach a conclusion within a reasonable period of time, and dismissed the jury after 13 hours of deliberation. The Court of Appeals held the trial judge did not abuse his discretion.[7]

Fish claims that the circumstances of jury dismissal were not "extraordinary and striking." He argues that the jury had deliberated for only 15 hours, which he contends was a short period of time relative to the complexity of the issues and length of the trial (eight days). In addition, he argues that the judge did not make any inquiry into the degree of jury entrenchment, but relied only on the jurors' assertions that they could not reach a unanimous verdict.

We find no abuse of discretion here. Unlike *Jones*, the jury notified the trial court three times, on its own accord, that it was unable to reach a verdict. On the first two occasions, the court ordered the jury to continue deliberating. After the third occasion,[8] the judge inquired of the foreman and each of the jurors whether they were hopelessly deadlocked. All agreed that they were. Further, contrary to Fish's assertion, the trial court was not required to determine how the jury stood numerically. This type of limited inquiry is discretionary and subject to great deference by a reviewing court.[9] After 15 hours of deliberation,

---

[5]*State v. Jones*, 97 Wn.2d 159, 165, 641 P.2d 708 (1982). In *Jones*, the jurors deliberated from 11:10 A.M. to 10:35 P.M., at which time the judge called the jurors into the courtroom and asked whether they could reach an agreement by midnight. After the foreman responded that it was a possibility, the jury deliberated until midnight, at which time the trial court asked if the jury could reach at decision by 1:30 A.M. After the foreman and jurors said reaching a decision by 1:30 was not possible, the trial court declared a mistrial.

[6]33 Wn. App. 648, 656 P.2d 1137 (1983).

[7]*Id.* at 651.

[8]On the third occasion, the foreman wrote: "After careful deliberation with each juror voicing their opinion we have come to the conclusion that we will not be able to come to a solution in this matter now or in the future. We are a hung jury."

[9]*Jones*, 97 Wn.2d at 164-65.

three separate notes to the court indicating jury deadlock, and individual polling of the jurors, the court was justified in concluding that the jury was hopelessly deadlocked. The trial court did not abuse its discretion and Fish's retrial was not barred by the double jeopardy clause.

## Fifth Amendment Privilege

Outside the presence of the jury during the first trial, Dean Baxter invoked the Fifth Amendment and declined to answer any questions about the evening of the shooting. Baxter's attorney had earlier informed the court that he had advised Baxter not to answer these questions because he believed "there may be some criminal liability which is alleged as a result of this incident and Mr. Baxter's acts on that evening." The State indicated it would not grant immunity to Baxter, and also noted that Baxter's testimony could result in his being charged for display of a deadly weapon or obstruction of justice. Fish asserts that the trial court abused its discretion by permitting Baxter to assert his Fifth Amendment privilege.

■■ The federal and state constitutions provide that no person shall be compelled in a criminal case to be a witness or give evidence against himself.[10] This privilege includes the right of a witness not to give incriminating answers in any proceeding.[11] The danger of incrimination must be substantial and real, not merely speculative.[12] Unless the answer to a question would obviously and clearly incriminate the witness, a claim of privilege must be supported by facts which, aided by the "use of reasonable judicial imagination," show the risk of self-incrimination.[13] "The answer need only furnish a link in the chain of evi-

---

[10]U.S. Const. amend. V; Wash. Const. art. I, § 9.

[11]*Kastigar v. United States*, 406 U.S. 441, 445-46, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972).

[12]*State v. Hobble*, 126 Wn.2d 283, 290, 892 P.2d 85 (1995) (citations omitted).

[13]*State v. Lougin*, 50 Wn. App. 376, 381, 749 P.2d 173 (1988) (internal quotation marks omitted).

dence needed to prosecute the witness for a crime."[14] The determination of whether the hazards of self-incrimination are genuine and whether the privilege applies is within the sound discretion of the trial court.[15]

Here, the allegations that Baxter waved the gun around, yelled death threats out the car window, pointed the gun at the other car, and later denied any knowledge of the gun establish a factual predicate that could have "furnished a link" leading to criminal prosecution. We need not speculate or predict, as Fish claims, whether Baxter's testimony would have provided the State with any new information that could lead to his prosecution or even whether the State would take any steps toward prosecuting Baxter.[16] It is sufficient that Baxter's testimony regarding his actions on the evening in question could subject him to criminal prosecution. The trial court did not abuse its discretion in permitting Baxter to assert his Fifth Amendment right.

Fish also argues that because the State granted transactional immunity to Shawlee Westmoreland, it should have done the same for Baxter. The decision to grant immunity is vested with the prosecution, and a defendant has no right to demand immunity for a defense witness in order to obtain exculpatory testimony unless a court finds the prosecutor's misconduct intimidated the witness to the point the witness declined to testify.[17] Fish has not shown that Baxter was intimidated into asserting his Fifth Amendment privilege as a result of any prosecutorial misconduct. Fish's contention is without merit.

---

[14]*Hobble*, 126 Wn.2d at 290 (internal quotation marks and citations omitted); *see also Hoffman v. United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 (1951).

[15]*Hobble*, 126 Wn.2d at 291.

[16]*See In re Master Key Litigation*, 507 F.2d 292, 293 (9th Cir. 1974) ("[T]he right to assert one's privilege against self-incrimination does not depend upon the *likelihood*, but upon the *possibility* of prosecution.") (citing *Hoffman*, 341 U.S. at 486-87); *see also Carter v. United States*, 684 A.2d 331, 336-38 (D.C. 1996) (citing cases).

[17]*State v. Carlisle*, 73 Wn. App. 678, 681, 871 P.2d 174 (1994).

ER 404(b)

Fish argues that the trial court abused its discretion by excluding a photograph, taken hours before the shooting, which depicts Baxter holding his gun to Silver Jacobson's head. The trial court ruled that the photograph would be admissible only for impeachment purposes in the event one of the witnesses denied having seen Baxter with a gun on the night of the shooting. Fish contends that the photo was necessary to show Baxter's reckless and provocative display of the gun as part of the res gestae of the crime.

■ ■ ER 404(b) provides that evidence of other acts is not admissible to prove the character of a person in order to show action in conformity therewith. Under the res gestae or "same transaction" exception, evidence of other crimes is admissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place."[18] Each act must be "a piece in the mosaic necessarily admitted in order that a complete picture be depicted for the jury."[19] The determination of admissibility under ER 404(b) is a matter within the sound discretion of the trial court.[20]

Here, the photograph of Baxter was not necessary to complete the story of what happened on the night of the shooting. Each of the State's witnesses testified that Baxter was carrying a gun with him, that he had shown it to everyone before they started driving around, and that he had cracked the windshield of Fred James' car with it. The witnesses also testified that Baxter had yelled epithets, including, "We're going to kill you," at the defendant's car. Baxter's behavior was thus fully described, and the photograph added no information about Baxter's acts that would complete Fish's account of the events that led up to the shooting. Baxter's prior "provocative act" also had no bearing on Fish's behavior, because Fish was neither pres-

---

[18]*State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995) (internal quotation marks omitted).

[19]*State v. Powell*, 126 Wn.2d 244, 263, 893 P.2d 615 (1995) (internal quotation marks omitted).

[20]*State v. Brown*, 132 Wn.2d 529, 571, 940 P.2d 546 (1997).

ent when the photograph was taken nor even aware of the existence of the individuals in the photograph before that evening. The trial court did not abuse its discretion in refusing to admit the photograph.

## ER 806

Fish asserts that testimony attributing various statements to Baxter should have been subject to impeachment pursuant to ER 806 by admission of portions of Baxter's statement to police. These statements include: Baxter's comment that there was no firing pin or clip in the gun; Baxter's directions to Fred James to "pull over" and drop them off, and his statement that he was going to get some beer; Baxter's statement after he ran back to the car that he saw a person "with a gun"; and the various epithets and threats Baxter yelled from the car. Fish argues that the trial court erred by not allowing him to impeach these hearsay statements with the account of the shooting Baxter gave to the police.

ER 806 provides:

> When a hearsay statement, or a statement defined in rule 801(d)(2)(iii), (iv), or (v), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.

ER 806 authorizes impeachment of a declarant only when the declarant's statement has been offered to prove the truth of the matter asserted. If the statement is offered for some other nonhearsay purpose, ER 806 does not apply.[21]

The first statement about the firing pin is hearsay, but admitting the remainder of Baxter's statement to police under ER 806 would not have impeached the hearsay statement because Baxter did not discuss the gun's operability.

---

[21] 5B Karl B. Tegland, Washington Practice: Evidence § 409, at 290 (3d ed. 1989).

None of the other statements in issue was offered for the truth of the matters asserted. Baxter's requests to "pull over and drop them off" were not assertions of fact, but commands. His statements that he was going to get some beer and that he saw someone with a gun similarly were not offered to prove that they actually got beer or that there actually was a person with a gun, although they were relevant to explain Baxter's state of mind. Similarly, the threats Baxter yelled were relevant only for the fact they were spoken, regardless of their "truth." The court did not abuse its discretion by refusing to admit Baxter's police statement under ER 806.

Affirmed.

The remainder of this opinion has no precedential value and will be filed according to the rules of the court. *See* RCW 2.06.040; RAP 10.4(h).

BAKER and COX, JJ., concur.

Review denied at 140 Wn.2d 1019 (2000).