[Nos. 41131-8-II; 41751-1-II.   Division Two.   March 6, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. JONATHAN MARK LUCAS, *Appellant*.

*In the Matter of the Personal Restraint of* JONATHAN MARK LUCAS, *Petitioner*.

*Jonathan Mark Lucas*, pro se.

*Maureen M. Cyr* (of *Washington Appellate Project*), for appellant.

*Anthony F. Golik*, *Prosecuting Attorney*, and *Anne M. Cruser*, *Deputy*, for respondent.

¶1 VAN DEREN, J. — Jonathan Mark Lucas appeals his convictions for second degree and fourth degree assault. In his direct appeal, he contends that the trial court (1) abused its discretion in admitting evidence of his prior conviction when he did not testify and (2) violated his speedy trial rights when it granted a continuance over his objection to allow his counsel more time to prepare a diminished capacity defense. In his personal restraint petition (PRP), he contends that the trial court failed to timely file necessary documents related to his appeal. We hold that the trial court abused its discretion in admitting evidence of Lucas's prior conviction and that the error was not harmless. We reverse Lucas's conviction and remand for further proceedings. We also deny his PRP.

## FACTS

¶2 On September 4, 2009, while walking down the street in Vancouver, Washington, around 6:00 p.m., Terry Taylor

heard "[a] bunch of yelling." Report of Proceedings (RP) at 219. While Taylor waited to cross the street, Lucas, the source of the yelling, came into view and continued walking toward Taylor. Taylor felt that Lucas's behavior was "erratic" because Lucas was unintelligibly cursing, "yelling," and "ranting." RP at 220, 229-30. Lucas followed Taylor across the street and overtook him. Taylor, who felt fearful, turned to face Lucas, and Lucas stepped within arm's length. Taylor told Lucas to stop and to get away from him, and Lucas, who was still ranting and yelling unintelligibly, cursed and punched Taylor in the side of his face and ear. As Taylor backed away, Lucas advanced, so Taylor fled down the street and called 911.

¶3 Boulder County, Colorado, Deputy Sheriff Jeffrey Caton, who was off-duty and pulling into a nearby restaurant parking lot, observed Taylor running down the street with Lucas in pursuit. A man emerged from the restaurant and told Caton that Lucas had just assaulted Taylor. Caton identified himself to Taylor, Taylor told him what had happened, and Lucas walked around the corner and began approaching them. Caton ordered Lucas to go away and to leave the area, but Lucas continued approaching. Caton displayed his firearm and badge, identified himself as a deputy sheriff, and again ordered Lucas to back away and to leave, but Lucas continued advancing.

¶4 When Caton tried to push Lucas away, Lucas reached over Caton's arms and punched him in the nose. Caton drew his firearm and ordered Lucas to get down. Lucas, who was yelling, screaming, and cursing, refused to comply, said, " 'I don't care' " and " 'I'm not going to do what you say,' " and began walking away. RP at 245-46.

¶5 Vancouver Police Department Officer Franklin Gomez, who had arrived at the scene, repeatedly ordered Lucas to get on the ground. When Lucas turned, stared at Gomez, and refused to comply, Gomez drew his stun gun and warned Lucas that he would deploy it if Lucas did not comply. Eventually, Lucas complied and was handcuffed and placed in the back of Gomez's patrol car.

¶6 Another responding police officer read Lucas his *Miranda*[1] rights and asked Lucas what had happened. Lucas said that Taylor had "disrespected" him, so he "slapped" Taylor. RP at 308. Lucas denied hitting Caton and repeatedly stated, " 'Why am I under arrest? Just let me go home. I won't cause any more problems.' " RP at 308.

¶7 Gomez also spoke with Lucas. Lucas also told him that he "slapped" Taylor because Taylor had disrespected him, denied hitting Caton, and said, " 'I don't know what you are talking about and take me to jail.' " RP at 287. Although Lucas was responsive to Gomez's questions, Lucas had a strong odor of alcohol on his breath, his speech was slurred, and when he vomited in Gomez's patrol car, his vomit also smelled of alcohol.

¶8 The State charged Lucas with second degree assault, count one, and fourth degree assault, count two. At his arraignment, Lucas's counsel stated that after reviewing the police report and Lucas's mental health treatment history, he believed that Lucas should pursue a diminished capacity defense. But Lucas's counsel indicated that he needed Lucas to waive his speedy trial rights to effectively prepare this defense because he needed to obtain more of Lucas's mental health records and to retain an expert to evaluate Lucas. Lucas's counsel stated, " '[Lucas] has indicated he may not want to do that. No, I don't think—I think he indicated he wants to rely on his speedy trial rights . . . I think I should waive speedy trial for him. He may not want to. He may want to have an objection to it.' " RP at 3-4. Later, Lucas's counsel stated, " '[Lucas] is not apparently waiving.' " RP at 4-5. The trial court found that Lucas's counsel needed additional time to prepare a possible diminished capacity defense, set a new commencement date of November 28, 2009, and set trial for January 27, 2010. The trial court entered a written speedy trial waiver that Lucas refused to sign.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶9 Lucas's trial began on March 8, 2010.[2] Doctor Jerry Larsen, a psychiatrist, testified as an expert for Lucas on his diminished capacity defense. According to Larsen, a review of Lucas's mental health treatment history demonstrated a history of paranoid schizophrenia "going back many years," "characterized by hallucinations, by delusions, [and] by behavioral excesses such as bizarre behaviors." RP at 326. He stated that alcohol consumption would exacerbate those symptoms.

¶10 Larsen also interviewed and examined Lucas. Lucas told him that on the morning of September 4, 2009, he had consumed a large amount of alcohol and that he remembered little else other than vomiting and waking up in jail. Lucas also said that he had not taken his psychotropic medication for 10 days. Larsen stated that Lucas's assault on Taylor and Caton was consistent with acting out on a paranoid schizophrenic delusion. He opined that at the time of the assaults, Lucas was incapable of forming the necessary intent to commit a crime or of calculating the risk of his actions.

¶11 Outside the presence of the jury, the State moved to cross-examine Larsen with evidence of Lucas's 2001 first degree robbery conviction, arguing that Lucas was "essentially testifying through [Larsen] about the events in question" and, because Larsen partially based his evaluation on Lucas's statements, Lucas's "credibility and truthfulness" was at issue. RP at 340. Over Lucas's objection, the trial court allowed the State to cross-examine Larsen about Lucas's conviction, reasoning:

> [I]n general, the hearsay statements that experts testify to are subject to a curative instruction; that the hearsay is only

---

[2] The record does not indicate why trial began on March 8, 2010, instead of the January 27, 2010, trial date set by the trial court at Lucas's arraignment. On February 5, 2010, the trial court held a hearing on the State's motion to appoint experts to evaluate Lucas based on his diminished capacity defense. Defense counsel observed that "[t]here is no issue of competency so trial time is not tolling, as I understand the rule," and the trial court's order appointing experts did not mention continuing the trial date. RP at 11. It appears from the record that Lucas remained in custody pending trial.

introduced for the purpose of explaining how the individual formed their opinion. It is not offered for the truth of the matters asserted and only to allow the set up to their opinion. However, to the extent that credibility is an issue with regard to the doctor's opinion, [ER] 806 would appear to apply. It does say that a hearsay statement, once it has been admitted, credibility of the declarant may be attacked and may be supported by any evidence that would be admissible for those purposes, if the declarant had testified as a witness [sic]. So, it is permissible for the State to bring in [Lucas's robbery conviction].

RP at 341-42.

¶12 During cross-examination, Larsen stated that he was aware of Lucas's 2001 first degree robbery conviction. Larsen also testified on cross-examination that (1) he evaluated Lucas four months after the assaults; (2) Larsen could not verify Lucas's statements and took them at "face value"; (3) Lucas was very specific in stating the number of drinks and number of days without taking his medication despite his claim of memory loss on the day of the assaults; (4) Larsen did not know what symptoms Lucas experienced while not taking his medication, and paranoid schizophrenics usually avoid people instead of confronting them; (5) someone who has "blacked out" from excessive alcohol consumption can still engage in a series of intentional acts; and (6) Lucas demonstrated cognitive ability after the assaults by complying with law enforcement's commands and by conversing with them. RP at 350, 355.

¶13 Doctor Gregory Kramer, a psychologist, testified as the State's expert. He also diagnosed Lucas with paranoid schizophrenia based on Lucas's mental health treatment history. But Kramer stated that during the assaults there was evidence of only Lucas's intoxication, not symptoms of paranoid schizophrenia. He testified that Lucas's statement that he slapped Taylor because he "felt disrespected" and his conversation with law enforcement and eventual compliance with their commands demonstrated his capac-

ity to form intent at the time of the assaults. RP at 402. Kramer opined that the evidence showed that Lucas was capable of both forming intent and making risk calculations at the time of the assaults.

¶14 The jury found Lucas guilty as charged. Lucas unsuccessfully moved for arrest of judgment or for a new trial. Lucas filed his direct appeal, and then he filed a motion to dismiss the entire case because appellate counsel, due to the trial court's untimely filing of documents with this court, was never appointed. We converted his motion to dismiss into a PRP and consolidated it with his direct appeal.

## ANALYSIS

### ER 806 AND EXPERT TESTIMONY BASED ON OUT-OF-COURT STATEMENTS

¶15 Lucas first argues that the trial court abused its discretion in allowing the State to cross-examine Larsen about Lucas's prior conviction. The State counters that the trial court did not abuse its discretion because Lucas's statements, to which Larsen testified as part of the basis of his expert opinion, were offered for the truth of the matter asserted and, thus, impeachment under ER 806 was proper. We agree with Lucas.

A. Standard of Review

¶16 We review the trial court's admission of evidence for abuse of discretion. *State v. Bashaw*, 169 Wn.2d 133, 140, 234 P.3d 195 (2010). A trial court abuses its discretion when it bases its decision on unreasonable or untenable grounds. *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009). We review the interpretation of evidentiary rules de novo. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003).

## B. Basis of Expert's Opinion Was Not Hearsay

¶17 ER 806 provides, "When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness."

¶18 ER 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted.*" (Emphasis added.) Thus, "ER 806 authorizes impeachment of a declarant only when the declarant's statement has been offered to prove the truth of the matter asserted. If the statement is offered for some other nonhearsay purpose, ER 806 does not apply." *State v. Fish,* 99 Wn. App. 86, 95, 992 P.2d 505 (1999).

¶19 ER 703 allows expert witnesses to base their opinions on facts otherwise inadmissible as long as the facts are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." ER 705 provides, "The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data." Thus, as our Supreme Court has observed:

> The trial court may allow the admission of otherwise hearsay evidence and inadmissible facts for the purpose of showing the basis of the expert's opinion. The admission of these facts, however, is not proof of them.

> [I]f an expert states the ground upon which his opinion is based, his explanation is not proof of the facts which he says he took into consideration. His explanation merely discloses the basis of his opinion in substantially the same manner as if he had answered a hypothetical question. It is an illustration of the kind of evidence which can serve multiple purposes and is admitted for a single, limited purpose only.

*Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue,*
106 Wn.2d 391, 399-400, 722 P.2d 787 (1986) (alteration in
original) (citations omitted) (quoting *State v. Wineberg,* 74
Wn.2d 372, 382, 444 P.2d 787 (1968)).

¶20 In other words, out-of-court statements on which
experts base their opinions are not hearsay under ER 801(c)
because they are not offered as substantive proof, i.e., "the
truth of the matter asserted." Rather, they are offered "only
for the limited purpose of explaining the expert's opinion."
5D KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HAND-
BOOK ON WASHINGTON EVIDENCE ER 703 author's cmt. at 387,
ER 705 author's cmt. at 400 (2011-2012 ed.); *see also State
v. Lui,* 153 Wn. App. 304, 322-23, 221 P.3d 948 (2009)
(stating that admission of out-of-court statements did not
implicate the confrontation clause because they were ad-
mitted to explain the bases for experts' opinions, not for the
truth of the matter asserted), *review granted,* 168 Wn.2d
1018 (2010); *State v. Anderson,* 44 Wn. App. 644, 652-53, 723
P.2d 464 (1986) (stating that trial court did not abuse its
discretion in allowing the State's experts to testify about
Anderson's out-of-court statements to them because the
statements were not offered to prove the truth of the matter
asserted); *State v. Fullen,* 7 Wn. App. 369, 379, 499 P.2d 893
(1972) (" 'The hearsay rule does not prevent a witness from
testifying as to what he has heard; it is rather a restriction
on the proof of fact through extrajudicial statements.' "
(quoting *Dutton v. Evans,* 400 U.S. 74, 88, 91 S. Ct. 210, 27
L. Ed. 2d 213 (1970))).[3] Accordingly, out-of-court statements
offered at trial as the basis of an expert's opinion are not

---

[3] We note that the United States Supreme Court recently heard oral argument
in *People v. Williams,* 238 Ill. 2d 125, 939 N.E.2d 268, 345 Ill. Dec. 425 (2010), *cert.
granted,* 131 S. Ct. 3090 (2011). In *Williams,* the Illinois Supreme Court held that
an expert's testimony about the facts and out-of-court statements in another
laboratory's report not admitted into evidence was offered to explain the basis of
the expert's opinion, not for the truth of the matter asserted, and, thus, did not
implicate the confrontation clause. 238 Ill. 2d at 132-33, 141, 143-45, 150.

We also note that the Washington State Supreme Court granted review in *Lui,*
168 Wn.2d 1018, and on September 19, 2011, stayed review pending the United
States Supreme Court's decision in *Williams.* Although we continue to rely on
existing case law about the purpose for which trial courts admit facts and

hearsay and, thus, do not expose the declarant to impeachment under ER 806.

¶21 The State argues that such an interpretation of ER 806, ER 703, and ER 705 would allow a defendant to "place his version of the events before the jury without any adversarial testing." Br. of Resp't at 4. But we rejected a similar argument in *State v. Eaton*, 30 Wn. App. 288, 291-93, 633 P.2d 921 (1981), concluding that "the proper way to test the reliability of the [expert's] opinion [i]s through cross-examination of the [expert], not by requiring the defendant to testify" and impeaching the defendant with a prior conviction. We observed:

> [T]he probative value of expert medical testimony may be lessened when it is based on subjective symptoms and narrative statements given by a defendant after he has been charged with a crime. The assumption underlying ER 703, however, is that opposing counsel will forcefully bring that point to the jury's attention during cross-examination of the expert. Jurors are quite aware that a criminal defendant may be motivated to fabricate a defense and are unlikely to be influenced unduly by an expert opinion that is shown to rest on questionable sources of information. Moreover, experienced forensic psychiatrists are equally aware of the danger of fabrication and are trained to detect untruthful answers to their questions.

*Eaton*, 30 Wn. App. at 294-95 (citations omitted). Here, the State extensively and effectively cross-examined Larsen, including casting doubt on the credibility of Lucas's statements by adducing Larsen's testimony that he took such statements at "face value" with no means to verify them, thus rendering any reference to Lucas's prior conviction unnecessary. RP at 350. Under these circumstances, we hold that the trial court abused its discretion in allowing the State to cross-examine Larsen with evidence of Lucas's prior conviction.

---

out-of-court statements forming the basis of expert opinions, we note the uncertainty currently surrounding this area of law.

## C. Error Was Not Harmless

¶22 Lucas argues that the trial court's admission of his prior conviction burdened his constitutional right to present a defense and, thus, we should review the issue under the constitutional harmless error standard. He also argues that the error was not harmless under the nonconstitutional standard of review.

¶23 But if the error was not harmless under the less stringent nonconstitutional standard, we need not decide whether the trial court's error was constitutional in magnitude. *Accord Eaton*, 30 Wn. App. at 297. An error of nonconstitutional magnitude is harmless unless we can conclude that within reasonable probabilities, the error materially affected the trial's outcome. *Eaton*, 30 Wn. App. at 295-96.

¶24 For example, in *Eaton*, Eaton did not deny at trial that he broke into a liquor store, but he contended that he was too intoxicated to form the necessary intent to commit a crime. 30 Wn. App. at 290. He intended to call a psychiatrist to opine, based largely on two interviews with Eaton in which he gave his recollection of the events of the date in question, that Eaton was incapable of forming the required intent to commit a crime when entering the store. *Eaton*, 30 Wn. App. at 290. Concerned about the potential introduction of Eaton's out-of-court statements through the expert's testimony, the trial court erroneously required Eaton to testify at trial and allowed the State to impeach him with evidence of a prior robbery conviction. *Eaton*, 30 Wn. App. at 290-91, 295. We noted based on empirical studies of the time that "[t]here is a significant danger that jurors will consider prior convictions admitted for impeachment purposes as substantive evidence of guilt, regardless of instructions to the contrary." *Eaton*, 30 Wn. App. at 291 n.4. In holding the error was not harmless, we reasoned:

> [Eaton']s prior robbery conviction was revealed to the jury as a result of his taking the stand. . . . In all likelihood, the jurors'

verdict depended greatly on their assessment of defendant's credibility. A negative assessment of his credibility conceivably would have influenced the weight the jury gave to the opinion of Dr. Maletzky, defendant's key witness. In these circumstances, we must conclude that the additional evidence placed before the jury as a result of the court's error probably had an effect on the verdict.

*Eaton*, 30 Wn. App. at 297.

¶25 We observe that, generally, cases finding that the erroneous admission of defendants' prior criminal convictions was harmless "have turned on the fact that the defendant had other prior convictions that *were* properly admissible." *State v. Calegar*, 133 Wn.2d 718, 728, 947 P.2d 235 (1997). That factor is not present in Lucas's case.

¶26 Further, the State admits that like the credibility contest in *Eaton*, "[t]his case came down to a disagreement between experts." Br. of Resp't at 11. The jury's possibly negative assessment of Lucas's credibility—arising from the erroneous admission of his prior conviction—conceivably and negatively influenced the weight they gave to Larsen's testimony, and Lucas's key witness for his only viable defense of diminished capacity. Accordingly, we hold that the error was not harmless and reverse and remand for further proceedings.

¶27 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

WORSWICK, A.C.J., and JOHANSON, J., concur.