# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

          Respondent,

          v.

JOJO D. EJONGA,

          Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 70069-3-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: May 26, 2015

APPELWICK, J. — Ejonga appeals his conviction for three counts of attempted murder in the first degree. Ejonga asserts that his trial counsel was ineffective for pursuing an insanity defense, rather than arguing diminished capacity. He contends that the State deprived him of due process by destroying video footage that might have supported his mental defenses. He raises four issues in his statement of additional grounds. We affirm.

## FACTS

Jojo Ejonga had a troubled upbringing. He grew up in the Democratic Republic of the Congo, where his father was a bodyguard for President Mobutu Sese Seko. As a child, Ejonga suffered illness and injury, after which his mother noticed a change in his disposition. When Mobutu was removed from power, Ejonga's father was killed. Ejonga was six years old at the time. When Ejonga was 14 years old, his mother was arrested. She escaped and fled to Nigeria. Sometime after his mother's arrest, Ejonga was hit in the head with the butt of a soldier's rifle and knocked unconscious. In 2006, Ejonga met up with his mother in Nigeria, and in 2010, they immigrated to the United States.

Ejonga attended Highline Community College, where he met Valerie Maganya. Maganya and her mother, Estella Nyandwi, are also from the Congo. Ejonga and

Maganya became friends, and Ejonga would occasionally stay over at the house Maganya shared with her mother.

One day, Nyandwi discovered that some of her money was missing. She asked her daughter about it, because there were checks totaling over $1,000 written in Maganya's name. Maganya realized that the handwriting on the checks matched Ejonga's. Maganya also discovered that $3,000 was missing from her own bank account. Maganya confronted Ejonga, who initially denied taking the money. When Maganya told Ejonga there was video footage showing him withdrawing the money, Ejonga confessed and promised to pay her back for the stolen money.

Maganya saw Ejonga again at a birthday party a week later. After the party, Ejonga jumped into a car that was parked in front of Maganya's. Ejonga put the car in reverse and hit Maganya's car. Ejonga then jumped out of the car, laid down, and played dead. The collision caused $1,100 in damage to Maganya's car.

An hour later, Ejonga posted on Facebook that he did not care what happened that night, because he had the best lawyers and they would take care of him. Maganya responded by posting that Ejonga was a thief and a fraud and that no one should let him into their homes. Ejonga then messaged Maganya that he would pay for the car if she took down the post. Mangaya agreed.

On May 8, 2011, Maganya and Nyandwi went out to dinner with Tuwalole Mwamba, Maganya's brother's girlfriend. Mwamba, who was seven months pregnant, had suggested they celebrate Mother's Day together because they were all mothers. On the way home from dinner, Maganya got a call from Ejonga, who asked if she would like

to come pick up her money. Nyandwi and Mwamba volunteered to go along. Maganya drove, Nyandwi was in the front passenger seat, and Mwamba was in the back seat.

At 8:30 or 9:00 p.m., they went to meet Ejonga in the parking lot of his mother's apartment in Kent. Ejonga was upset that Maganya brought Nyandwi and Mwamba along. He told them that he did not have the money, because his cousin had it in Des Moines. Maganya agreed to drive Ejonga to Des Moines to get the money. Ejonga got into the backseat behind Maganya.

Ejonga directed Maganya to the parking lot of an apartment complex. He got out and made a call, accidentally dialing Mwamba instead of his cousin. He then got back in the car, closed the back window, and asked the women what they were doing. Maganya and Mwamba replied that they were on Facebook.

Ejonga then began to stab Mwamba with a kitchen knife. Mwamba was able to escape the car and started to run away. Ejonga then reached into the front seat and stabbed Maganya. He told her, "I'll kill you today, Valerie." He also stabbed Nyandwi, slicing her tongue. Nyandwi and Maganya were eventually able to escape from the car. Ejonga jumped out of the car and chased after Mwamba. When he caught up with Mwamba, he struck her and she fell. Ejonga stabbed her as she lay in a ball on the ground.

A resident from a nearby apartment saw Ejonga attacking Mwamba and yelled at him to let her go. Ejonga ran away. He threw his jacket over a fence, along with a bloody paper towel in which he had been holding the knife. A witness observed him doing so

and directed the police to the items. Another witness saw Ejonga shedding his T-shirt and discarding it.

All three women survived, and one was able to identify their attacker to the police. During an area search nearby, Officer Kevin Montgomery encountered Ejonga walking along the road. It was very dark, so Officer Montgomery drove past Ejonga a few times to make sure he matched the suspect's description. When Ejonga moved into a better lit area, Officer Montgomery stopped and walked up to him. Ejonga told Officer Montgomery that his name was "Eric." He was nervous and sweating. Officer Montgomery observed that Ejonga had scratches on his face, his clothes were disheveled, and there was a dark stain on his shoes that looked like blood.

Officer Montgomery arrested Ejonga. Officers discovered a knife where Officer Montgomery first spotted Ejonga. DNA (deoxyribonucleic acid) profiling showed that Ejonga's and Mwamba's DNA were present on the knife.

Officer Shawn O'Flaherty transported Ejonga to the police station. Later that night, Officer J. Coppedge transported Ejonga from the station to the hospital and back. Patrol car videos were recorded during both transports.

Ejonga was charged with three counts of attempted murder in the first degree and three counts of assault in the first degree.

Ejonga's trial counsel pursued a defense based on mental illness, citing the traumatic experiences from Ejonga's youth. Counsel hired psychiatrist Dr. Jerome Kroll to evaluate Ejonga's mental state at the time of the offense. Ejonga told Dr. Kroll that when he got back into Maganya's car, it seemed that the car was full of al-Qaeda

4

members who had guns and knives and were going to kill him. Ejonga said he had been suspicious and fearful that night and brought the knife along for protection. According to Ejonga, he believed he was stabbing the terrorists, not the three women he knew. Dr. Kroll diagnosed Ejonga with delusional mood disorder, post-traumatic stress disorder (PTSD), and mood disorder secondary to brain injury. At trial, Dr. Kroll testified about Ejonga's delusion and opined that, as a result of his mental state, Ejonga was unable to know right from wrong, to know the nature of his actions, or to form a criminal intent.

In rebuttal, the State called Dr. Mark McClung, a forensic psychiatrist who also assessed Ejonga. Dr. McClung opined that Ejonga had antisocial personality traits and probable PTSD but also demonstrated malingering psychiatric symptoms. Dr. McClung testified that he did not believe Ejonga's psychiatric problems rendered him unable to appreciate the nature of his actions or the difference between right and wrong.

Ejonga was convicted of three counts of attempted murder in the first degree. He was sentenced to 792 months in custody. He appeals.

## DISCUSSION

Ejonga argues that his trial counsel was ineffective for pursuing an insanity defense, rather than focusing on a diminished capacity defense. He contends that the State denied him due process by destroying patrol car video footage taken after his arrest. He filed a statement of additional grounds, arguing improper expert testimony, ineffective assistance of counsel, and prosecutorial misconduct.

5

I.   Ineffective Assistance of Counsel

Ejonga argues that his trial counsel was ineffective for pursuing an insanity defense, which was certain to fail, rather than focusing on a diminished capacity defense, which had a greater likelihood of success. He further asserts that counsel was ineffective for calling an expert witness lacking in credibility. He maintains that these failures prejudiced him, because there was a reasonable probability the jury would have accepted a diminished capacity defense, especially if supported by a credible expert.

We review de novo a claim of ineffective assistance of counsel. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on an ineffective assistance claim, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness based on consideration of all the circumstances and (2) the deficient performance prejudiced the trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Deficient performance is that which falls below an objective standard of reasonableness. State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). If counsel's conduct can be characterized as a legitimate trial strategy or tactic, performance is not deficient. Id. Prejudice occurs if, but for the deficient performance, there is a reasonable probability that the outcome of the proceedings would have been different. Id. at 34. There is a strong presumption of effective assistance. Id. at 33.

Insanity is an affirmative defense requiring the defendant to show that, at the time of the commission of the offense, as a result of mental disease or defect, the defendant's mind was affected to such an extent that (1) he was unable to perceive the nature and quality of the act charged or (2) he was unable to tell right from wrong with reference to

6

the particular act charged. RCW 9A.12.010(1); State v. Crenshaw, 98 Wn.2d 789, 792-93, 659 P.2d 488 (1983). Diminished capacity is not a true "affirmative defense," but an argument that a specific element of the offense, mens rea, has not been proved. See State v. Gough, 53 Wn. App. 619, 622, 768 P.2d 1028 (1989). A defendant is entitled to a diminished capacity instruction when there is substantial evidence of a mental condition that logically and reasonably connects with the inability to possess the required level of culpability to commit the crime charged. State v. Cienfuegos, 144 Wn.2d 222, 227-28, 25 P.3d 1011 (2001).

Ejonga asserts that counsel was ineffective for failing to argue diminished capacity, because that defense, unlike insanity, had a reasonable probability of success. However, the record shows that counsel rigorously pursued the diminished capacity defense. Before trial, she hired Dr. Kroll to evaluate Ejonga's mental state at the time of the incident, including whether he had the ability to form a criminal intent. Dr. Kroll interviewed Ejonga and concluded that Ejonga was unable to tell right from wrong or form the requisite criminal intent. Counsel indicated in her trial memorandum that she intended to pursue both defenses and would call Dr. Kroll to testify.

Counsel continued to pursue the defense at trial. In opening statements, counsel referred to the diminished capacity standard, telling the jury that Ejonga was "incapable of forming a criminal intent." Counsel questioned Dr. Kroll about Ejonga's mental state, and Dr. Kroll opined that Ejonga fit within both the insanity standard and the diminished capacity standard. And, counsel requested—and the court gave—an instruction stating, "Evidence of mental illness or disorder may be taken into consideration in determining

7

whether the defendant had the capacity to form the intent to inflict great bodily harm or the premeditated intent to kill."

Ejonga acknowledges that the jury was given a diminished capacity instruction but asserts that defense counsel failed to argue it to the jury. However, in closing, counsel addressed both defenses, even discussing diminished capacity first. She told the jury that it was "asked to assess [Ejonga's] mental state at the time of the acts charged." After reviewing Dr. Kroll's testimony, she noted that his opinion was that Ejonga was "unable to form intent." She then directed the jury's attention to the relevant jury instructions and explained:

> You'll have two instructions bearing on this. One is the instruction that talks about mental state, that's Instruction No. 7. Evidence of mental illness or disorder may be taken into consideration in determining whether the defendant had the capacity to form the intent to inflict great bodily harm or the premeditated intent to kill.
>
> So if you find that because of his mental illness or disorder he was unable to form that intent or the premeditation, then you must find him not guilty. But even if you find that the State has proven all of the elements of the crimes, including the mental state, you must still find him not guilty by reason of insanity if you find that it's more probably true than not that as a result of a mental disease or defect the defendant's mind was affected to such an extent that he was unable to perceive the nature and quality of the acts with which he is charged or unable to tell right from wrong with reference to the particular acts with which he is charged.

In sum, Ejonga's assertion that counsel failed to pursue the diminished capacity defense is not supported by the record and provides no basis to find ineffective assistance of counsel.

Ejonga also suggests that counsel was deficient for even pursuing the insanity defense. Defense attorneys in criminal cases have wide latitude to control strategy and tactics, including which defense theory to pursue. See, e.g., In re the Pers. Restraint of

Davis, 152 Wn.2d 647, 745, 101 P.2d 1 (2004). Counsel pursued diminished capacity, the defense Ejonga now argues was proper. Ejonga cites no authority for the assertion that, once counsel has selected a proper defense, counsel is ineffective for pursuing an additional defense that is less likely to succeed.

Ejonga further asserts that defense counsel was deficient in failing to make a self-defense argument to support the diminished capacity defense. However, the aggressor in a conflict may not avail himself of a claim of self-defense. State v. Craig, 82 Wn.2d 777, 783-84, 514 P.2d 151 (1973). Ejonga asserts that he was not the aggressor, because in his delusion the terrorists created the dangerous situation. But, the only evidence of Ejonga's delusion came from the testimony of Drs. Kroll and McClung about what Ejonga told them. Out-of-court statements on which experts base their opinions are not hearsay, because they are not offered as substantive proof, i.e., the truth of the matter asserted. State v. Lucas, 167 Wn. App. 100, 109, 271 P.3d 394 (2012). Instead, they are offered only for the limited purpose of explaining the expert's opinion. Id. The experts' testimony recounting Ejonga's out-of-court statements cannot support a self-defense instruction. And, the substantive evidence—namely, testimony from Maganya, Nyandwi, and Mwamba—contradicts Ejonga's assertion that he was not the aggressor. A self-defense instruction was not proper here. Failing to ask for a self-defense instruction was not deficient.

Ejonga also challenges defense counsel's decision to call Dr. Kroll as a witness, asserting that Dr. Kroll lacked credibility. "Ordinarily, the decision whether to call a witness is a matter of legitimate trial tactics and will not support a claim of ineffective

assistance of counsel." State v. Maurice, 79 Wn. App. 544, 552, 903 P.2d 514 (1995). Despite this, Ejonga raises numerous criticisms of the expert. None of them demonstrate that Dr. Kroll lacked credibility, much less that counsel was ineffective for calling him.

First, Ejonga asserts that Dr. Kroll demonstrated ignorance of the legal standard. Dr. Kroll admitted that he failed to recall the standard for diminished capacity during a pretrial interview with the prosecutor. However, Dr. Kroll testified that he had the standard in front of him when he wrote his report concluding that Ejonga was unable to form a criminal intent.

Second, Ejonga argues that Dr. Kroll used an outdated copy of the Diagnostic and Statistical Manual of Mental Disorders. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (4th rev. ed. 2000) (DSM-IV-TR); AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 1994) (DSM-IV). Dr. Kroll brought the DSM-IV with him to trial, rather than the newer DSM-IV-TR. He testified that he was familiar with the DSM-IV-TR and that it was a "minor update" and that the two volumes are "substantially the same."

Third, Ejonga criticizes Dr. Kroll for interviewing only Ejonga and his mother, whereas the State's expert interviewed several people. The witnesses that Dr. McClung interviewed did not report that they observed signs of mental impairment. That information would have been largely unhelpful to support Dr. Kroll's assessment.

Fourth, Ejonga complains that Dr. Kroll finished his opinion before the electroencephalogram (EEG) or the magnetic resonance imagery (MRI) results were

known. The EEG and MRI results did not indicate any brain abnormalities. But, Dr. Kroll explained that the normal results did not affect his diagnosis.

Finally, Ejonga observes that Dr. Kroll is a psychiatrist, not a forensic psychologist. Ejonga maintains that, for "an expert's opinion to carry weight with the jury, having the ability and credentials to deftly merge psychology and the law is imperative." Ejonga cites no authority for this assertion. And, his suggestion that an expert should specialize in the law is problematic, as an expert witness may not give an opinion on matters involving questions of law. Everett v. Diamond, 30 Wn. App. 787, 792, 638 P.2d 605 (1981).

Ejonga has not shown that his counsel's performance was deficient. His ineffective assistance claims fail.

## II.   Video Footage of Police Transport

Ejonga contends that the State denied him due process by destroying video footage that might have supported his mental defense. We review an alleged violation of due process de novo. State v. Johnston, 143 Wn. App. 1, 11, 177 P.3d 1127 (2007). Due process requires that the prosecution disclose material exculpatory evidence to the defense and preserve such evidence for use by the defense. Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); State v. Wittenbarger, 124 Wn.2d 467, 475, 880 P.2d 517 (1994). If the State fails to preserve material exculpatory evidence, criminal charges must be dismissed. Wittenbarger, 124 Wn.2d at 475. To constitute "material exculpatory evidence," the evidence must "possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the

defendant would be unable to obtain comparable evidence by other reasonably available means." Id.

The evidence in question here is video footage taken in Officer Coppedge's patrol car during Ejonga's postarrest transport from the police station to the hospital. The footage was destroyed after 90 days pursuant to police department policy. However, footage of Ejonga's transport earlier that night—from the crime scene to the police station—was preserved. During the earlier transport, Ejonga asked the officer if his parents[1] were notified. Because his father had been dead for many years, Ejonga argued that this demonstrated he was mentally unstable. Accordingly, Ejonga asserted, the destroyed tape might have also been favorable and material to his mental defenses.

If a defendant makes a specific request for evidence preservation, he is denied due process if there is a reasonable possibility the destroyed evidence was favorable and material. State v. Boyd, 29 Wn. App. 584, 589-90, 629 P.2d 930 (1981). A specific request is one giving the prosecutor or police notice of exactly what the defense desired. Id. In Boyd, the court found that a request was sufficiently specific even though the defendant mistakenly requested a recording taken the day after the incident occurred. See id. at 586, 589-90. The request also included the defendant's name, cause number, and the crime involved. Id. at 589. The court reasoned that, because the defendant indicated these specific identifying details, he gave notice of exactly what he wanted notwithstanding the reference to the wrong day. Id. at 586, 589-90.

---

[1] The State argued below that Ejonga actually asked "is my parent aware," in the singular. Defense counsel disputed this assertion. The video from Officer O'Flaherty's patrol car is not part of the record on appeal.

Here, Ejonga sought "all physical evidence relating to the alleged offense including, but not limited to, police communications (911) tapes, and the scene of the alleged crime" and "[a]ny written or recorded statements and the substance of any oral statements made by [Ejonga]." Although Ejonga's request was not as specific as in Boyd, it explicitly referenced police tapes and recordings of Ejonga's statements. Assuming without deciding that this was sufficiently specific, Ejonga cannot establish a violation of due process. Ejonga acknowledges that he cannot prove the video was exculpatory or material. Nor can he show a reasonable possibility that it was. Officer Coppedge's written report about the transfer indicated no bizarre behavior on Ejonga's behalf. Evidence may be material and favorable if there is a reasonable probability that it tends to rebut a police officer's testimony. City of Seattle v. Fettig, 10 Wn. App. 773, 776, 519 P.2d 1001 (1974). But, Officer Coppedge did not testify, and his report was not admitted into evidence. There is no other evidence as to what occurred during the transport. Thus, Ejonga can make only speculative assertions about the usefulness of the video. This is insufficient to demonstrate a violation of due process. See State v. James, 26 Wn. App. 522, 525, 614 P.2d 207 (1980) ("Speculation that evidence might be exculpatory is not enough.").

Ejonga did not suffer a violation of his right to due process as a result of the video's destruction.

III.    Statement of Additional Grounds

Ejonga raises four issues in his statement of additional grounds. First, Ejonga argues that Dr. McClung relied on a test that was not normed for the African population

13

and was out-of-date. But, the trial court found that the test was not reasonably relied upon by experts in the field and excluded any testimony based on the test.

Second, Ejonga argues that his counsel was ineffective for failing to call as a witness the jail psychiatrist who treated Ejonga. The jail psychiatrist did not testify. Nothing in the record establishes what that testimony would have been. We cannot review this assertion of ineffective assistance.

Third, Ejonga argues that the prosecutor committed misconduct by falsely alleging that he stole Nyandwi's money and damaged Maganya's car. And fourth, Ejonga argues that his counsel was ineffective for failing to object to the prosecutor's allegations. The prosecutor's statements were based on the victims' testimony. The testimony was properly elicited as proof of motive under ER 404(b). The prosecutor did not commit misconduct. Counsel's failure to object was not ineffective.

We affirm.

WE CONCUR:

14