# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57943-0-II |
| Respondent, | |
| v. | |
| LOLA FELIPA LUNA, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J. — In January 2021, Lola Felipa Luna and SPT, two teenaged girls, engaged in a verbal altercation that turned physical. During the fight Luna repeatedly stabbed SPT, sending her to the hospital in critical condition. SPT died a few hours after the fight while receiving care in the hospital. The case went to trial and a jury found Luna guilty of murder in the second degree. On appeal, Luna raises a variety of evidentiary arguments. She argues that the trial court erred in (1) admitting evidence of a prior fight between Luna and another girl; (2) admitting character evidence to disprove Luna's self-defense theory and show motive and intent; (3) admitting evidence of a 911 call made by SPT's friends on the way to the hospital; (4) excluding character evidence of SPT; (5) excluding evidence to support Luna's alternative cause of death theory; and (6) admitting an interrogation interview after finding that Luna knowingly waived her *Miranda* rights. Luna maintains that the cumulative effect of these evidentiary errors deprived her of a fair

trial. Alternatively, Luna argues that if these evidentiary errors are deemed to be waived or invited, then Luna is entitled to reversal due to ineffective assistance of counsel.

We hold that the trial court did not abuse its discretion in most of the decisions it made to which Luna now assigns error. However, the court did err in admitting character evidence from Luna's social media in order to prove motive and intent and to disprove Luna's theory of self-defense. The error was harmless, however, because it is not reasonably probable that the admission of the evidence materially affected the outcome of trial. We therefore affirm.

FACTS

I. BACKGROUND & UNDERLYING CRIME

A. Background Leading up to the Fight

Prior to the day of the fight, SPT and Luna had never met in person. The two had only communicated on social media. Luna and SPT had mutual connections, including another teenaged girl, HD. In August 2020, five months before the fight between Luna and SPT, Luna and HD got into a physical fight at the Kitsap shopping mall (the mall fight). HD testified at trial that the fight between her and Luna occurred over "drama about a boy," because HD had become "really close with [Luna's] ex-boyfriend." 2 Verbatim Rep. of Proc. (VRP) at 448. Luna testified that the fight occurred because Luna heard through mutual friends that HD was "talking about [her]." 4 VRP at 1224. Luna also testified that she and HD reconciled and became cordial again after the fight.

SPT and HD were close friends; HD saw SPT as an older sister figure. On the day of the fight, SPT told HD that she wanted to fight Luna. According to HD, the fight between HD and Luna was only part of why SPT wanted to fight Luna. HD testified that Luna and SPT "had drama," but she could not recall what it was about, specifically. 2 VRP at 456-57. SPT told HD to send

Luna a message saying that HD wanted to fight her and asking for her address. Luna responded and provided HD with her address. HD testified that when Luna provided HD with her address, Luna was unaware that HD was communicating with SPT and that Luna did not know that SPT planned to go to Luna's house to fight her.

B. The Fight & SPT's Death

SPT received Luna's address from HD and traveled to Luna's house. SPT was accompanied by two of her friends, JO and KN. SPT's infant daughter was also in the car. According to JO, when they arrived at Luna's house, she got out of the car and accompanied SPT to the sidewalk in front of Luna's house. Luna's house sits above the sidewalk; a flight of approximately 13 stairs separates the fenced-in front yard from the sidewalk. SPT went up the stairs but JO remained on the sidewalk below. JO observed the fight from below. Luna's stepdad and boyfriend were also present and stood outside observing the fight. Luna's boyfriend videotaped the fight.

The fight itself spanned for approximately 30 seconds. The video shows Luna holding a knife slightly behind her while having a heated conversation with SPT. Eventually, SPT took the first swing and then Luna and SPT exchanged punches and hit each other repeatedly. The two eventually separate and as she started to walk away, back to the car where her friends were waiting, SPT exclaimed, "What the [f***] is wrong with you? Girl, what the [f***]?" Ex. 103, at 48 sec. The video captured Luna's boyfriend behind the camera stating "She just stabbed her." *Id*., at 49 sec.

SPT walked away from Luna's house, back to the street where JO and KN were waiting for her with the car. According to JO, SPT did not look good when she reached them and "[t]here

3

was just a lot of blood." 2 VRP at 233. KN and JO called 911 while driving SPT to the hospital. During the call, KN and the operator discussed the car's location in relation to the hospital and KN shared overarching details about the fight between Luna and SPT that lead to SPT's injuries. KN shared the following details with the operator: ". . . and she got stabbed pretty bad . . . in the face, in the stomach in the back." Ex. 97, at 23 sec. Either JO or KN can be heard pleading with SPT, saying "[SPT, SPT, SPT, SPT] come on stay awake [SPT] come on." *Id.*, at 2 min., 1 sec. KN and JO are clearly shaken up but they remain relatively calm on the phone. Someone can be heard breathing heavily and someone can be heard crying in the background.

It took the group roughly five minutes to drive to the nearby hospital. However, the emergency room at the local hospital had recently shut down, and it only had an urgent care center. As such, when the girls arrived at the hospital, SPT did not receive treatment immediately and an ambulance was called. A police officer arrived to the hospital parking lot before the ambulance and began taking photos of SPT's injuries while she laid down in the car. Approximately three minutes later, the ambulance arrived and began administering care.

SPT received medical care from the team of EMTs that arrived at the local hospital in the ambulance. The medics administered epinephrine as well as ketamine. It became clear that SPT was in critical condition and needed to be airlifted to the trauma center at Harborview Medical Center in Seattle. The medics transferred SPT to the flight team, who continued providing care and also administered epinephrine. The team at Harborview was prepared and waiting for SPT's arrival and sprang into action to attempt to stabilize her as soon as the helicopter arrived.

Despite the ongoing efforts from medical personnel, SPT was declared dead at 3:27 PM. At the time of her death, the attending doctor made the presumed finding that she died of

hemorrhagic shock, meaning that she bled to death. The medical examiner who performed the autopsy on SPT testified that she suffered 24 sharp force wounds. At the time of her death, SPT had stab wounds on her face, her neck, her chest, her arm, and her back.

Officer Hoyson of the Bremerton Police Department responded to Luna's house after the fight. When Hoyson arrived at the house Luna's stepdad answered the door, and Luna came to the door to speak to Hoyson. Hoyson noticed that Luna had cuts on her hands. Luna told Hoyson that she had learned someone was coming to her house to fight her, and that during the fight she stabbed the other party. At the time of this statement Luna was not free to leave but had not been told that she was being detained.

Following this statement, Hoyson arrested Luna. Officer Hoyson handcuffed and read Luna her Fifth Amendment rights, as well as the juvenile warning. Luna told Hoyson that she understood her rights. The officers then took Luna to the police station, where she was again advised of her Fifth Amendment rights and interviewed by Detective Martin Garland in an interrogation room. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

## II. PROCEDURE AND TRIAL[1]

Luna was charged by amended information with one count of murder in the first degree and two counts of murder in the second degree (one count charging intentional murder and one count charging felony murder based on the underlying felony of assault in the second degree).

Prior to trial, the court held an ER 404(b) hearing and a CrR 3.5 hearing. The trial court found that Luna's statements were made voluntarily and after Luna waived her *Miranda* rights.

---

[1] For conciseness, we discuss additional facts in our analysis section below that do not appear in this statement of facts.

The interview was video recorded and then admitted and played for the jury. Luna objected to the admission of her statements made to the police following her arrest.

The case proceeded to trial and several witnesses to the fight and the events leading up to the fight testified for the State consistent with the facts outlined above.

During Luna's interview with Detective Garland, she told Garland that SPT did not overpower her during the fight. Luna also told him that she stopped stabbing SPT because she became too tired and worn out to continue stabbing SPT. Detective Garland believed that Luna did not know, at the time of the interview, whether SPT was still alive.

During the interview, Luna contradicted HD's version of events leading up the mall fight. She explained to Detective Garland that HD had been speaking disrespectfully about Luna's brother, who helped raised Luna. Luna said she was feeling protective and that's why she fought with HD. She claimed that on the day of her fight with SPT, she did not want to fight HD, or anyone else for that matter. Luna said that she and HD had already settled their drama and become friends again so she was confused as to why HD was texting her asking to fight. She told Garland that she kept the pocket knife with her for self-defense, because there was a group of girls that wanted to "jump" her, and it made her particularly nervous that a group of people showed up at her house wanting to fight her. Ex. 102, at 2 min., 10 sec.

Luna asserted that she stabbed SPT in self-defense. Luna testified that she was afraid of SPT. The day before the fight, Luna said that HD sent her messages on Snapchat to arrange a place for HD and Luna to fight. Luna declined HD's invitation to fight. The next morning, the day of the fight, HD messaged Luna again asking to fight. Luna told HD that HD could come to Luna's house. She said, "I didn't genuinely think that [HD] was going to come to my house or that there

6

was -- anything bad was going to happen. I thought all it would take was us talking and figuring out what the issue was and how to solve that." 4 VRP at 1318-19.

HD did not come to Luna's house, but SPT did. Luna testified that every time she walked outside of her house, she brought her pocketknife with her. In explaining why, she said that she brings it "[f]or multiple reasons. Opening stuff, . . . like packages with tape and stuff. If I were to get into a situation where I needed to use something to protect myself, then I would have that on me at the time." *Id.* at 1320. Luna testified that she was surprised to see SPT walk through her front gate. When Luna and SPT first started talking, Luna testified that she had the pocketknife in her pocket. Luna testified that as SPT got closer and, according to Luna, became more aggressive in her posturing, Luna took out her pocketknife and slipped it behind her back. Luna claimed that she was afraid that SPT was going to hurt her. She also testified that she did not retreat into the house as things escalated because she was afraid that SPT would attack her from behind. Luna testified that she used her knife because SPT started choking her. Luna claimed that at the time, she was not aware whether her knife was making contact with SPT during the fight. Luna testified that she could not tell whether using the knife had any effect on SPT.

The jury found Luna guilty of murder in the second degree with a deadly weapon enhancement and she was sentenced to 168 months in prison. [2] This timely appeal followed.

---

[2] Luna was found guilty of murder in the second degree as charged in both counts II and III, with a deadly weapon enhancement finding as to count II. The trial court vacated the verdict in count III so as to avoid double jeopardy.

ANALYSIS

Luna challenges the admission of the following evidence at her trial: (1) a TikTok video showing the mall fight between HD and Luna; (2) a TikTok video that Luna shared of herself that followed a trending video template at the time, based on the film *The Purge*, (referred to as "the Purge video"); (3) a comment Luna made on social media regarding "stabbing energy;" (4) the 911 call that SPT's friend, KN, made while they drove SPT to the hospital; and (5) the video of Luna's interview with a detective on the day of the stabbing. Br. of Appellant at 37.

Additionally, Luna argues that the court erred in excluding evidence she offered about SPT's character and evidence regarding Luna's theory of an alternative cause of death. Luna contends that if these errors do not alone warrant a new trial, there was cumulative error that entitles her to a new trial.[3]

We hold that (1) the trial court did not abuse its discretion in admitting the video of the mall fight, as the video was relevant to complete the story for the jury; (2) while the court erred in admitting Luna's social media post and comment to prove motive/intent and disprove self-defense, this error was harmless because it was not significant in light of the overall evidence; (3) the court did not err in admitting the recording of the 911 call; (4) the court did not err in excluding some character evidence of SPT because the excluded evidence lacked relevance and/or foundation; (5)

---

[3] Luna also asserts, without argument, that if we were to find any claim of error invited or unpreserved, she suffered ineffective assistance of counsel. This appears to be a throwaway argument, as Luna makes no attempt to show that the actions of counsel were not legitimate tactical decisions, and that as a result of those decisions the outcome of the trial would probably have been different. Luna also does not specifically identify the specific acts or omissions of counsel that she wants us to review as constituting deficient performance. We will not review an issue that has not been briefed or argued in a meaningful way. *Ameriquest Mortg. Co. v. State Att'y Gen.*, 148 Wn. App. 145, 166, 199 P.3d 468 (2009), *aff'd on other grounds*, 170 Wn.2d 418, 241 P.3d 1245 (2010).

the court did not err in excluding the toxicology report, as Luna's alternative cause of death arguments were speculative and would have confused the jury; (6) the trial court did not err in finding that Luna knowingly waived her *Miranda* rights, and Luna failed to prove that the new statute regarding juvenile interrogations was intended to apply retroactively; (7) Luna's claim of error related to Detective Garland's testimony about her veracity was invited; and (8) cumulative error does not warrant reversal. We affirm.

## I. PRIOR BAD ACTS UNDER ER 404(b) AND RES GESTAE

"The determination of admissibility under ER 404(b) is a matter within the sound discretion of the trial court." *State v. Fish*, 99 Wn. App. 86, 94, 992 P.2d 505 (1999). In general, character evidence is not admissible to prove conduct. ER 404. The rule reads, in relevant part:

> (a) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

> (1) Character of Accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same;

> (2) Character of Victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

> . . . .

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Id.* (boldface and italics omitted).

9

In order for evidence of prior misconduct to be properly admitted, the court must " '(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.' " *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). When it comes to weighing the probative value of a piece of evidence against its prejudicial effect, "trial courts have considerable discretion in determining this balance." *State v. Gantt*, __ Wn. App. 2d __, 540 P.3d 845, 858 (2024).

One of the exceptions allowing evidence that would otherwise be excluded by ER 404(b), is the res gestae exception. Under this exception, evidence of other bad acts may be permitted if they are part of the " 'same transaction' " as the charges at hand. *State v. Brown*, 132 Wn.2d 529, 570-71, 940 P.2d 546 (1997) (quoting *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995)). Such evidence is admissible in order to provide the jury with a full story through "establishing the immediate time and place of its occurrence," filling in gaps, and providing a " 'link in the chain' of an unbroken sequence of events surrounding the charged offense." *Id.* at 571 (quoting *State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981)). In other words, each act that is admitted under res gestae "must be 'a piece in the mosaic necessarily admitted in order that a complete picture be depicted for the jury.' " *Fish*, 99 Wn. App. at 94 (internal quotation marks omitted) (quoting *State v. Powell*, 126 Wn.2d 244, 263, 893 P.2d 615 (1995)). In determining whether evidence falls within an exception to ER 404(b), the court must answer "whether the bad acts are relevant for a purpose other than showing propensity." *State v. Slocum*, 183 Wn. App. 438, 456, 333 P.3d 541 (2014).

## II. THE TRIAL COURT DID NOT ERR IN ADMITTING EVIDENCE OF THE MALL FIGHT UNDER RES GESTAE EXCEPTION

The court admitted a video made on TikTok showing the mall fight between HD and Luna which occurred in August 2020. The TikTok video is ten seconds long and begins with Luna and HD walking towards each other in the Kitsap Mall. The girls exchange punches and end up wrestling on the ground, where Luna appears to repeatedly punch HD.

In its offer of proof in support of this evidence being admitted, the State argued that Luna modified this video on the day she stabbed SPT: "A search of the Defendant's phone revealed that on January 30, 2021, the same date the Defendant planned to fight [HD] again and killed [SPT], the Defendant created a 'TikTok' video, imposing a song over the video of her attacking HD." Clerk's Papers (CP) at 36-37.

The trial court found that the video of the mall fight with HD was admissible as res gestae evidence because the video "was created relatively close to the incident date, if not the incident date itself, and was something that was potentially reviewed by the defendant at that time." Verbatim Rep. of Proc. (VRP) (Sept. 19, 2022) at 41.

Luna focuses the bulk of her argument on whether evidence of the mall fight should have been admitted *at all*—particularly, HD's testimony about the fight. In her brief Luna argues that the mall fight was too remote because it occurred nearly six months prior to the fight between Luna and SPT, and therefore cannot be considered to be part of an unbroken sequence of events. She further argues that the mall fight was not necessary to tell the story of what happened between Luna and SPT and that "the mall fight with [HD] was just one reason why [SPT] decided to attack [Luna]." Br. of Appellant at 41 (emphasis omitted).

But Luna did not object to HD testifying about the fight on the grounds that it was irrelevant or would violate ER 404(b). In the trial court, Luna limited her 404(b) and relevancy objection to the *video* of the fight. As it relates to HD's testimony, Luna lodged hearsay, foundation, and "asked and answered" objections, but she did not argue that evidence of the fight, writ large, was inadmissible as improper evidence of other bad acts or irrelevant due to the passage of time. 2 VRP at 449, 451-52, 454. Because objecting to evidence in the trial court on one ground does not preserve an objection on appeal based on any or all *other* grounds, we decline to consider Luna's argument as it relates to the broader evidence of the mall fight and confine our analysis to the *video* of the fight. *See* RAP 2.5(a); *State v. Mason*, 160 Wn.2d 910, 933, 162 P.3d 396 (2007); *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985).

With respect to the admission of the video particularly, Luna argues in her brief that the video was unduly prejudicial because it was "set to inflammatory music with violent lyrics" and because HD's testimony about the fight was sufficient to alert the jury that there had been a prior conflict between HD and SPT, rendering the video unnecessary. Br. of Appellant at 42. But Luna did not make this argument in the trial court below. Luna's written response to the State's motion to admit ER 404(b) evidence focused primarily on case law and did not parse out the many different items of evidence the State sought to admit. The mall video is not mentioned at all in the written memorandum beyond it being lumped in with the other ER 404(b) evidence that Luna generally objected to on the ground that it did not show Luna's motive or intent to stab SPT. To the extent that Luna now argues that the mall video was unduly prejudicial because it was set to "inflammatory music," this argument is raised for the first time on appeal. *Id.*

The State responds that "the mall altercation is what precipitated the events that led to the stabbing," but does not respond specifically to Luna's argument about the supposedly inflammatory nature of the music. Br. of Resp't at 29-30. The State further responds that the evidence surrounding the mall fight was properly admitted under the res gestae theory because it "completes the story of the crime charged." *Id.* at 29. The State explains that "without the mall fight evidence, the entire crime would appear to the jury in a vacuum. It was therefore highly relevant and properly admitted under ER 401 and ER 402." *Id.* at 30.

Even assuming we should consider this particular argument for the first time on appeal, the trial court did not abuse its considerable discretion in admitting this video. First, it depicts the level of animosity between HD and Luna in a way that may not have been adequately conveyed by testimony alone. Although Luna suggests that the prior altercation with HD had nothing to do with the altercation she had with SPT, this ignores the fact that HD was the common denominator in the friction between Luna and SPT, and it was only through her communications with HD that Luna came into contact with SPT on the day of the stabbing. SPT went through HD to get Luna's address. Even though HD testified that the fight between Luna and SPT occurred, in part, due to separate tensions between Luna and SPT, Luna's fight with HD still played a role. Furthermore, Luna watched, and possibly edited, the TikTok on the same day of her fight with SPT.

Although Luna relies on cases suggesting that prior acts involving different actors should not be admitted under res gestae, this, again, ignores the interrelationship between Luna, HD, and SPT. Moreover, the video of the fight could have benefitted Luna because it somewhat contradicts HD's testimony and paints Luna in a more favorable light. For instance, HD claims that Luna

approached her from behind and started fighting her in the mall, but the video shows the two walking towards each other before starting to fight.

The trial court did not abuse its discretion in admitting the video of the mall fight because the video was not unduly prejudicial in light of the other evidence presented to the jury and because it depicted HD—one of the State's key witnesses—in an equally unfavorable light.[4]

### III. THE TRIAL COURT ERRED IN ADMITTING A SOCIAL MEDIA VIDEO AND COMMENT TO SHOW MOTIVE/INTENT AND DISPROVE SELF-DEFENSE BUT THE ERROR WAS HARMLESS

Luna argues that the trial court erred in admitting a video that the parties refer to as "the Purge video," as well as comments she made on social media about "stabbing energy," based upon its finding that these posts demonstrated Luna's plan, intent, and motive to stab SPT.

"The Purge video" is a TikTok video that Luna made of herself and apparently posted about three months prior to the murder. In the video, Luna appears to be holding a large kitchen knife. The caption posted onto the video reads "once those purge sirens go off i know exactly what girls house im going too." Ex. 99. The trial court held that the video was admissible evidence because it was relevant as to Luna's state of mind and intent, and was highly probative. The trial court explained that the video depicted Luna "fantasizing about stabbing another girl," and that the depiction of Luna "repeatedly stabbing a large kitchen knife at the camera" was relevant to her

---

[4] Relying on cases dealing with juvenile sentencing, Luna argues for the first time on appeal that because of her age, the trial court abused its discretion in admitting evidence of the mall fight because of the impetuosity of juveniles and their diminished ability to appreciate consequences. The State asks us not to consider this new claim for the first time on appeal. Because Luna cites no cases suggesting that a trial court must consider the mitigating qualities of youth when deciding whether to admit evidence, this argument was not sufficiently developed below and we decline to consider this issue for the first time in this appeal. *State v. Davis*, 141 Wn.2d 798, 850, 10 P.3d 977 (2000).

state of mind, her motive, and her intent. VRP (Sept. 19, 2022) at 41-42. The trial court determined that the probative value of the video outweighed its prejudicial effect.

During Luna's testimony, she explained that she made "the Purge video" around Halloween 2020 and it was based off of a popular TikTok trend and template that was based on the thriller movie, *The Purge*. It was part of a larger trend and when Luna made the video, she had already seen over 100 similar videos.

With respect to the "stabbing energy" comment on social media, this refers to the following exchange which occurred between Luna and another person on Instagram three weeks before the murder:

> [Other Person:] "That's funny cause weren't you just last weekend blowing our phones up to pull up but we are the only ones with the issue?? And weren't you the one posting about [N.D.] cause you was upset your [N****] was cool with her but WE have the issue?? Righttt. You know we wouldn't even be having this issue but guess who decided to keep running there mf mouth?? Nobody likes a [b****] who only likes to talk [s***] on social media. What happened to allll that energy saying you was gonna stab us and our moms?? But it's alright she finna learn her lesson soon (yawning face emoji)

> [Luna]: @[other person] if im blowing up y'all's phones or something.. literally cause [N.D.] wants to post slick [s***] (neutral face emoji). *no the stabbing energy has never left* (loudly crying face emoji). I do wtf want when tf wanttt"

CP at 39 (emphasis added) (some alterations in original). The comments were posted on Instagram on January 10, 2021. The court admitted this post, explaining that "the defendant's statements are a good indication of what's going on in her mind regarding motive intent or premeditation." VRP (Sept. 19, 2022) at 42-43.

Luna argues that these posts were "[a]morphous" and were not a serious expression of Luna's intent. Br. of Appellant at 47. Luna relies on *State v. Wade*, 98 Wn. App. 328, 335, 989 P.2d 576 (1999) for the well-settled proposition that the mere commission of a similar prior act

15

cannot be used to show propensity to commit the current act. Stated another way, even assuming Luna had, in the past, harbored the true intent to stab someone, that prior intent is not admissible, without more, to show that she harbored a similar premeditated intent to stab SPT. The intent to commit a particular crime against a particular person on one date is not evidence of intent to commit the same crime against a *different person* on a *different date*. *Wade*, 98 Wn. App. at 335. Luna contends that not only was this evidence inadmissible to prove her intent, motive, plan, or state of mind, but the evidence "[w]as [f]ar [m]ore [p]rejudicial [t]han [p]robative." Br. of Appellant at 49.

The State responds that both of the posts that Luna currently challenges, "the Purge video" and the "stabbing energy" comment, were made shortly prior to the incident between Luna and SPT. As such, the State argues, the posts were evidence of Luna's premeditated intent[5] and negated her claim of self-defense.

We hold that the trial court erred in admitting "the Purge video" and the "stabbing energy" comment under ER 404(b). However, the error is harmless because it is not reasonably probable that the admission of these two pieces of evidence materially affected the outcome of the trial. *See State v. Gunderson*, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014). With respect to "the Purge video," it was too far removed in time from the fight between Luna and SPT to be probative of Luna's intent or state of mind. Moreover, it is precarious for the State to use TikTok videos that employ "trends" as proof of the creator's state of mind. TikTok is a social media application in which people post videos both of original, extemporaneous content as well as videos that draw on popular

---

[5] At the time the State sought admission of this evidence, Luna was also charged with first degree murder. The jury acquitted Luna of that charge.

"trends" within the app.[6] It is questionable that a person could draw an inference about a creator's intent or actual state of mind in a video that is made for the purpose of participating in a TikTok trend. In the absence of some form of expert testimony interpreting or explaining the trend being represented in the video, there is a significant risk that a jury would misuse or be confused by this evidence—particularly if the jury is comprised of older adults who are less likely to use or understand this application. Evidence that would confuse or mislead a jury should be generally be excluded because such evidence is not relevant under ER 403. *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022).

The same can be said of the "stabbing energy" comment. Although this is a much closer call given its relatively close proximity in time to the murder, the probative value of this evidence was outweighed by the danger it would confuse or mislead the jury. It is the stock in trade of teenagers to make improvident, ill-thought-out comments with the intent of being edgy and making an impression, or to garner a laugh from peers. We think it too risky to open the floodgates of examination to slang terms used by teenagers for use as evidence of intent in a murder case.

Neither the trial court nor the jury would have any way of knowing who Luna and the other person she was speaking with on Instagram were referring to in their cryptic, nearly indecipherable conversation. Most of the members of the judiciary in this state grew up in a time where our conversations were not permanently memorialized on a digital platform owned by a corporation

---

[6] *See, e.g.*, Amy Adler & Jeanne C. Fromer, *Memes on Memes and the New Creativity*, 97 N.Y.U. L. REV. 453, 553-55 (2022); Lillian H. Rucker, *The End of an Era: The Uncertain Future of Section 230 Immunity for Social Media Platforms*, 26 VAND. J. ENT. & TECH. L. 241, 248-49 (2023); Roseanne Planker, *Dance Like Everyone Is Watching: Why Tiktok Choreography and Copyright Aren't in Sync*, 42 CARDOZO ARTS & ENT. L.J. 231, 241 (2024).

subject to subpoena. This singular exchange, rife with slang terms and emojis and nearly devoid of punctuation, is entirely devoid of context.

A teenager using a popular TikTok template to join in a trend about a fictional thriller movie (made around the time of Halloween) does not speak to that teenager's intent and motive to commit murder three months later—particularly in light of the fact that it was HD who contacted Luna on the day of the murder as opposed to Luna seeking out HD and SPT. The same is true about Luna's use of youthful vernacular about "stabbing energy." This evidence from social media had little to no probative value, but carried a significant danger of confusing or misleading the jury.

For these reasons, the trial court erred in admitting "the Purge video" and the "stabbing energy" comment to prove Luna's intent and motive, and to disprove her theory of self-defense. However, the error was harmless. A trial court's error in admitting evidence is reviewed under the standard for nonconstitutional error. *Gunderson*, 181 Wn.2d at 926. A nonconstitutional error is harmless where there is not a reasonable probability that the error materially affected the verdict. *Id*. Here, in light of significant evidence introduced by the State showing that Luna did not use reasonable force during her fight with SPT, it is not reasonably likely that the admission of this evidence materially affected the jury's verdict.

While Luna was not aware that it was SPT, not HD, who intended to fight her, she still willingly provided HD with her address knowing that it might lead to a fight, as HD expressed the intention to fight. Luna could have declined to give HD her address. She could have stayed inside and not come to the door when SPT arrived. She could have called the police if she feared for her safety or she could have sought support from her stepfather, brother, or boyfriend, all of whom

18

were in the house at the time. Instead, Luna armed herself with a pocketknife and went outside. She held the knife behind her back while arguing with SPT and at no point did she warn SPT not to come near her. At no point during her interaction with SPT did she call for help from someone inside the house. As such, while the trial court erred in admitting "the Purge video" and the "stabbing energy" comment, these pieces of evidence carried minor significance in light of the overall evidence presented by the State to prove intent and to disprove Luna's claim of self-defense. *See Nghiem v. State*, 73 Wn. App. 405, 413, 869 P.2d 1086 (1994). The error was harmless because it is not reasonably probable that the admission of these two pieces of evidence materially affected the outcome of the trial. *See Gunderson*, 181 Wn.2d at 926.

### IV. THE TRIAL COURT DID NOT ERR IN ADMITTING THE 911 CALL

Luna argues that the trial court also erred in admitting the 911 call that SPT's friends made while driving her to the hospital.

As we note above, SPT's friends KN and JO called 911 while driving SPT to the hospital. During the call, KN told the operator that SPT "got stabbed pretty bad" in her face, stomach, and back. Ex. 97, at 23 sec. One of the friends can also be heard pleading with SPT to "stay awake" and "come on." *Id.* at 2 min., 3 sec. Someone can be heard crying in the background.

Luna, relying on *City of Auburn v. Hedlund*, 165 Wn.2d 645, 655, 201 P.3d 315 (2009), contends that this evidence was more prejudicial than probative and played to the emotions of the jury. The State responds that Luna did not properly object to the 911 call below, and therefore this claim should not be considered for the first time on appeal. The State also argues that Luna's reliance on *Hedlund* is misplaced and the call at issue here is distinguishable from the call in *Hedlund* because it does not resemble a "gruesome crime scene." Br. of Resp't at 73. We agree

with the State that the call in this case is nothing like the call in *Hedlund* and did not unduly prejudice Luna.

A. Legal Principles

Evidence Rule 403 states that even if evidence is relevant, it may still be "excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In reviewing a trial court's weighing of the probative value of a piece of evidence against its potential for prejudicial effect, an appellate court will overturn that finding " 'only if no reasonable person could take the view adopted by the trial court.' " *State v. Johnson*, 185 Wn. App. 655, 670-71, 342 P.3d 338 (2015) (quoting *State v. Posey*, 161 Wn.2d 638, 648, 167 P.3d 560 (2007)).

Luna relies on *Hedlund* for support. In *Hedlund*, the supreme court found that the trial court abused its discretion it admitting a recording of a 911 call because it was "inflammatory and of dubious probative value." *Hedlund*, 165 Wn.2d at 655. The call described multiple dead bodies with limbs cut off, including a decapitation (which was actually false). *Id.* The court found that the prejudicial effect outweighed the probative value because it included false and inflammatory details and gruesome depictions, and it was repetitive evidence and therefore unnecessary. *Id.* at 655-56

B. Application

The 911 call in this case bears no resemblance to the call in *Hedlund*. In *Hedlund*, the description of the accident scene was extremely gruesome, with depictions of severed limbs and a severed head, possibly belonging to a child. *Id.* at 655. Not only were these depictions

inflammatory, they were in some respects outright false. *Id. at* 656. Moreover, the condition of the car accident victims in the 911 call in *Hedlund* bore no relationship to the elements of the crimes that Hedlund was charged with (DUI, reckless driving as an accomplice, and furnishing alcohol to minors), which significantly diminished its probative value. *Id.* at 649, 655-57.

Here, while KN was emotional during the call, the evidence does not demonstrate that she exaggerated or falsely described the events. KN was relatively calm while describing what happened, where they were going, and SPT's injuries. Moreover, she did not describe gruesome or gory details, as the caller in *Hedlund* did. In admitting the call, the trial court did not take a view that "no reasonable person could take," and we conclude that the trial court did not abuse its discretion in admitting the recording of the 911 call. *Posey*, 161 Wn.2d at 648.

## V. The Trial Court Did Not Err in Excluding Character Evidence of SPT

At trial, Luna sought to introduce various exhibits that pertained to SPT's character, many of which came in the form of interactions and posts on social media.[7] Luna also sought to introduce a toxicology report showing that SPT's blood alcohol level was .082.

Luna argued that by excluding this evidence regarding SPT's character, and the level of alcohol in her system, the court deprived the jury of evidence that was necessary in evaluating Luna's claim of self-defense.

Within this group of exhibits that Luna offered, the court first excluded exhibit 159, which was a photo of SPT on social media that shows her holding a beer, for lack of relevance. Second, the court excluded exhibit 161D, which was a Facebook post shared by SPT with the text, "[m]y

---

[7] Most admissions were accompanied by a limiting instruction to the jury that they were only relevant to the defendant's state of mind and were not to be considered for any other purpose.

family needs a cousin only retreat. No aunties or uncles. Just straight ignorance and illegal activities." 4 VRP at 1176. The court excluded this exhibit for lack of relevance. Third, the court excluded Exhibit 161E, which was a post that SPT shared on Facebook featuring a cartoon picture with the statement, "You had all that mouth when I was pregnant, [b****] wassup." *Id.* at 1177. This was also excluded for lack of relevance. Fourth, the court excluded Exhibit 161H, which was another post that SPT shared to her Facebook page showing photos of Gucci gloves with a comment from another Facebook user that read "I want to murder my husband in these." *Id.* at 1181. The court found that this exhibit was not relevant and that any probative value would be outweighed by the prejudicial effect.

Next, the court excluded exhibit 161K, two messages between SPT and another person on social media, after finding them to be prejudicial. The messages appear to be about selling marijuana and possibly getting into a fight. The court also excluded exhibits 162, 163, 164, and 165. Exhibit 162 was an Instagram post of SPT purportedly making gang signs with her hands, which the court excluded because the prejudicial effect outweighed the probative value. Exhibit 163 was a Snapchat message captioned "Its Greenlight period." Ex. 163. The snapchat includes a photo of a woman whose identity is unclear, and the text imposed on the original snapchat reads "I want all the information anyone got on her." *Id*. Presumably, a second user sent a copy of the original snapchat to Luna, with additional text imposed on the photo, stating "[SPT] got a whole gang of mfs ready to take you out." *Id*. The State argued that exhibit 163 did not indicate that SPT was a part of the conversation, the source who claimed it was about SPT was unknown, and the evidence was hearsay. The court found that exhibit 163 was "not yet relevant" because it was "not

significantly tied to [SPT] concerning her attitude towards [Luna]" prior to the date of the fight. 4 VRP at 1164. As such, the court excluded exhibit 163 as hearsay and for lack of foundation.

Exhibit 164 was a Facebook post made by another user that SPT shared showing what appears to be a gun with a patterned design on it. The court excluded this exhibit after finding that the prejudicial effect outweighed the probative value. Exhibit 165 was a definition from Urban Dictionary defining the term "green light," which the court excluded for lack of relevance. *Id.* at 1168.

In addition to assigning error to the court's ruling excluding the above social media posts and comments, Luna also argues that because the court allowed good character evidence of SPT, it effectively opened the door for her to introduce the evidence outlined above. The character evidence that Luna argues "open[ed] the door" was testimony from SPT's sister, LT, that SPT was motherly and caring toward her family members. Br. of Appellant at 60. LT testified about how helpful SPT was, and how much her nieces and nephews loved her.

When Luna moved to admit the toxicology report as character evidence to show SPT's intoxication level at the time she was murdered, the court excluded it for lack of relevance. Luna argued that the report showed that SPT was "legally drunk." 3 VRP at 893. This was relevant, according to Luna, because it would demonstrate "the decedent's lack of boundaries and/or lack of impulse control which further shows her quarrelsome and violent disposition," and would explain why SPT fought Luna. CP at 176. The toxicology report showed that SPT's blood alcohol concentration was .082. The court ruled that SPT's reason for fighting Luna was irrelevant, and the State noted that it was not disputing that SPT was the first aggressor. The court declined to admit the toxicology report.

Luna argues that in excluding character evidence of SPT, the trial court denied Luna "her constitutional right to fully present her defense." Br. of Appellant at 53. She contends that the character evidence she sought to introduce, as well as SPT's alcohol level at the time of the fight, support the notion that she feared SPT and acted in self-defense.

The State responds that the court properly excluded certain exhibits based on a lack of relevance and foundation. Furthermore, the State highlights that the trial court did, in fact, admit a number of exhibits offered by Luna to support her self-defense claim.[8] We also note that the jury heard other evidence of SPT's consumption of alcohol and marijuana prior to the day of the stabbing. We agree with the State on this issue and hold that the trial court properly excluded the exhibits in question because they lacked relevance and foundation.

A. Legal Principles

While character evidence is generally inadmissible to prove conduct, ER 404 outlines multiple exceptions. The exceptions allow for:

> [e]vidence of a pertinent trait of character of the victim of the crime offered by an
> accused, or by the prosecution to rebut the same, or evidence of a character trait of

---

[8] Specifically, the trial court admitted the following exhibits offered by Luna to support her claim of self-defense: 161A, 161B, 161F, 161G, 161I, and 161L. Exhibit 161A shows a third-party's social media post which SPT shared that reads "don't let me get mad, i'll [f***] up the energy. ain't nobody having fun [laughing crying emoji]." Exhibit 161B features one social media post SPT made saying "I'm finna ruin this [b****] life real quick brb [laughing crying emoji]," and one social media post another user made, that SPT shared, reading "**Me, 3 hours in a relationship** 'I don't think I can do this anymore.' " Exhibit 161F is a social media post made by another user which SPT shared. The post depicts a zero-star rating icon and reads "Disrespecting my sister . . . would not recommend. i'll [f***] you up." Ex. 161F. Exhibit 161G shows a third-party's social media post which SPT shared that reads "Are you a [B]lack girl and if yes how did you get the scar on your left knee?" SPT captioned the post with "Fighting at Walmart." Ex. 161G. Exhibit 161I is a social media post that SPT made which includes a GIF (an animated set of images) with the caption "I will beat ur [a**]." Lastly, Exhibit 161L is a long string of messages between SPT and two other users on social media, in which they appear to be talking about social drama, affairs, and potentially fighting in the future.

peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

ER 404(a)(2). Character evidence of a victim's propensity toward violence "is admissible to show reason for apprehension and grounds for self-defense by the defendant." *State v. Cloud*, 7 Wn. App. 211, 217, 498 P.2d 907 (1972). "[S]uch evidence is admissible to show the defendant's reason for fear and the basis for acting in self-defense." *State v. Duarte Vela*, 200 Wn. App. 306, 319-20, 402 P.3d 281 (2017). "The vital question is the reasonableness of the defendant's apprehension of danger, and his good faith in acting upon such apprehension." *State v. Ellis*, 30 Wash. 369, 373, 70 P. 963 (1902).

B. Application

Luna relies primarily on *Duarte Vela*. In that case, Duarte Vela sought to introduce evidence that the victim threatened to kill his family and that the victim had a history of domestic violence. *Duarte Vela*, 200 Wn. App. at 320. He sought to introduce this evidence in order to establish his claim that he reasonably feared the victim and acted in self-defense when he killed the victim. *Id*. The trial court excluded the evidence and Division Three of this court held that doing so deprived Duarte Vela of his ability to present his defense. *Id*.

The character evidence of the victim excluded in this case did not involve threats to kill the defendant's family or a history of domestic violence. Rather, the bulk of the excluded exhibits that Luna complains of are irrelevant social media posts that lack context or any discernible relationship to this case, most of which were not even made by SPT but only shared by her. For

example, the exhibits include a photo of SPT drinking a beer, a cartoon meme,[9] and another user's

comment about Gucci gloves. While a few of the posts came directly from SPT, Luna failed to

prove relevance, demonstrate their probative value, and establish proper foundation. Accordingly,

the trial court did not abuse its discretion in excluding these exhibits.

With regard to SPT's alcohol level, Luna's argument focuses exclusively on the notion that

SPT was "legally drunk," citing the alcohol levels at which a person is deemed to be, per se, too

intoxicated to operate a motor vehicle. Br. of Appellant at 60. But SPT did not drive to Luna's

house, nor is there any allegation she was driving while intoxicated on the date of her murder. A

person having a blood alcohol level that exceeds the per se level for driving[10] is irrelevant where

the person is not charged with an alcohol-related driving offense. There is no concept of being

"legally drunk," as Luna phrases it, because mere intoxication, by itself, is not a violation of the

law. The trial court did not err in ruling that evidence that SPT's blood alcohol level exceeded the

per se level for driving a motor vehicle in Washington was not relevant to any issue to be decided

by the jury.

Because we find that the trial court did not abuse its discretion under the evidentiary

standard, we next must look to whether the trial court nevertheless violated the defendant's

constitutional right—in this case, Luna's Sixth Amendment right to present a defense. *Jennings*,

199 Wn.2d at 59. However, the evidence a defendant seeks to admit must still adhere to the other

rules of evidence: it must be relevant, and its potential prejudicial effect must not outweigh its

---

[9] A meme is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." *Meme*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/meme (last visited May 31, 2024).

[10] *See* RCW 46.61.502(1)(a); RCW 46.61.503(1)(b)(i).

probative value. *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983). Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. As we explain above, Luna failed to show how the character evidence that the trial court excluded was relevant to her claim of self-defense, and she failed to show that the probative value of some of the evidence outweighed its prejudicial effect. For example, the photo of SPT drinking a beer does not establish that Luna had good reason to fear her. Nor do the memes that SPT reposted. Luna was able to argue her theory of self-defense based on the considerable evidence of SPT's intent to engage in a physical fight with her and SPT's efforts, through HD, to contact Luna and set up the altercation. The trial court's rulings to exclude various pieces of character evidence that Luna offered did not violate her constitutional right to present a defense.

As for Luna's claim that LT's testimony about SPT being a good mother and a good aunt effectively opened the door for her admission of her proposed character evidence, that claim is misplaced. When a party opens the door for character evidence, the door is only open for the other party to rebut or contradict the evidence admitted. *State v. Vazquez*, 198 Wn.2d 239, 253-55, 494 P.3d 424 (2021). Here, Luna does not argue that this evidence would have been admitted to specifically contradict LT's claims that SPT was a good mother and aunt. Rather, Luna essentially seeks a balancing of the scales, as though each time one side successfully admits evidence, the other side gets to have an item admitted as well.

The trial court did not abuse its discretion in excluding this evidence, nor did it violate Luna's constitutional right to present a defense.

## VI. THE TRIAL COURT DID NOT ERR IN EXCLUDING EVIDENCE REGARDING LUNA'S ALTERNATIVE CAUSE OF DEATH THEORY

Luna claims that the trial court erred by preventing her from presenting evidence of an "alternative theory of death"—specifically, that the combined effect of the alcohol in SPT's system and the ketamine and epinephrine[11] she was administered while medical personnel were trying to save her life was the true cause of her death, not her multiple stab wounds. Br. of Appellant at 75. However, as the State points out, Luna's record citations in support of this assignment of error are to the portions of the record where she sought to introduce evidence of SPT's alleged alcohol intoxication as *character evidence*, and as evidence of *Luna's* state of mind about SPT's intent, not because it supported an alternative cause of death.

The portions of the record where Luna advised the trial court that she sought to offer an alternative cause of death are found at 2 VRP at 160-68, and 3 VRP at 886-899. In these portions of the record, Luna first sought to ask the emergency department physician about whether the administration of ketamine was the actual cause of SPT's death. The trial court ruled that this question would need to be posed to the medical examiner who performed the autopsy and determined the cause of death rather than the emergency department physician. Luna does not challenge this ruling.

Luna next sought to ask the medical examiner, Dr. Micheline Lubin, about SPT's blood alcohol level by questioning her about the toxicology report that had not been admitted. The trial court did not allow Luna to question the medical examiner about the toxicology report produced

---

[11] Although Luna mentions epinephrine in her brief, she did not mention epinephrine to the trial court as one of the drugs she sought to ask the medical examiner about as part of her question about whether something other than the stab wounds caused SPT's death.

by the crime lab because it ruled that the report was hearsay. Luna does not challenge this ruling on appeal. The trial court, however, expressly permitted Luna to ask Dr. Lubin whether anything other than the stab wounds caused SPT's death. Luna posed the question to Dr. Lubin, and Lubin replied "No." 3 VRP at 897.

It is unclear what alleged error Luna complains of on appeal. She was permitted to ask the medical examiner about an alternative cause of death, and Dr. Lubin replied "No" to the question. To the extent Luna is actually attempting to argue that she should have been permitted to introduce evidence of SPT's blood alcohol level, Luna did not call the toxicologist who tested SPT's blood for alcohol and subsequently prepared the report to testify. Moreover, Dr. Lubin prepared her report about SPT's cause of death before she received the toxicology report and did not rely on the report in forming her opinion about SPT's cause of death. Luna's claim of error fails.[12]

We additionally note that Luna did present expert testimony from a forensic pathologist at trial who testified about the nature and category of SPT's stab wounds. The pathologist testified

---

[12] Luna's reliance on *State v. Perez-Cervantes*, 141 Wn.2d 468, 476, 6 P.3d 1160 (2000), is unavailing. Here, Luna's claim is predicated either on actions of the trial court to which she does not assign error (the trial court's hearsay ruling with respect to the toxicology report, and the trial court's ruling that questions about an alternative cause of death needed to be asked of the medical examiner rather that the emergency department physician), or an action that did not actually occur (the trial court did not prevent Luna from asking the medical examiner about an alternative cause of death).

Moreover, in *Perez-Cervantes* the supreme court held that the trial court did not err in excluding argument regarding an alternative cause of death. 141 Wn.2d at 480. The court reasoned that such an argument would only be admissible if the defendant could present evidence to show that "[the victim's] drug use or failure to seek medical attention caused a fatal injury independent of the stabbing, or that these acts constituted a subsequent, proximate cause that Perez-Cervantes could not have reasonably anticipated." *Id.* at 478. Here, Dr. Lubin was unwavering in her testimony before the jury that it was SPT's numerous stab wounds that caused her death.

that the amount of time it took for SPT to receive emergency care could have impacted her chances of survival.

## VII. THE TRIAL COURT DID NOT ERR IN ADMITTING LUNA'S CUSTODIAL STATEMENTS TO THE POLICE

Luna objected to the admission of her custodial statements made to Detective Garland during an interview at the police station under CrR 3.5.[13]

When officers responded to Luna's house after the stabbing, Officer Hoyson, after asking Luna some preliminary questions, arrested Luna and read her the *Miranda* warnings, including a juvenile warning advising her that if she is under 18, any statements she made could be used against her in a juvenile court prosecution as well as an adult court prosecution in the event she was tried as an adult. Luna responded that she understood the rights Hoyson read to her. Luna did not appear to be confused by the rights that were read to her, nor did she appear to be under the influence of any substances. After reading Luna her rights, Hoyson did not ask Luna any additional questions. The officers then took Luna to the police station, where she was interviewed by Detective Garland.

Before beginning the interview with Luna, Detective Garland asked Luna whether she wanted anything to eat or drink, and offered her use of the restroom. Garland also reread Luna her *Miranda* rights and the juvenile warning, and advised her the interview was being recorded. Garland testified that Luna responded that she understood her *Miranda* rights, as well as the juvenile addition, and was aware that the interview was being recorded.

Luna told Garland that at no point in the fight did SPT overpower her. Luna also told him that she stopped stabbing SPT because she became too tired and worn out to continue. As far as

---

[13] Luna does not challenge the statements she made to Officer Hoyson prior to her arrest when Hoyson responded to Luna's house in response to the 911 call.

Detective Garland knew, Luna did not know, at the time of the interview, whether SPT was still alive.

In addition to Garland's testimony, the video of Luna's police interview was played for the jury.[14] Luna now challenges the admission of her custodial statements to law enforcement.

A. Legal Principles

*1. Waiver of Rights*

The right not to incriminate oneself arises from the Fifth Amendment to the United States Constitution, as well as article I, section 9 of the Washington Constitution. *State v. Radcliffe*, 164 Wn.2d 900, 905, 194 P.3d 250 (2008). To protect this right, a suspect must receive *Miranda* warnings when facing custodial interrogation by an agent of the State. *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). A person is in custody if "a reasonable person in a suspect's position would have felt that [their] freedom was curtailed to the degree associated with a formal arrest." *Id*. at 218.

If a suspect does not receive *Miranda* warnings, their statements are presumed involuntary and must be excluded. *Id*. at 214. If a suspect received *Miranda* warnings and proceeded to give a statement, the State bears the burden to show that the suspect knowingly, intelligently, and voluntarily waived their *Miranda* rights. *State v. Athan*, 160 Wn.2d 354, 380, 158 P.3d 27 (2007). "Factors considered include a defendant's physical condition, age, mental abilities, physical

---

[14] During the interview, Luna made several exculpatory statements that she could not otherwise put before the jury without testifying. For example, she said that on the day of the stabbing she did not want to fight HD or anyone else. She said that she and HD had settled their dispute and become friends again and she was confused why HD would be texting her asking to fight. Luna told Garland that she kept the pocket knife with her for self-defense, because there was a group of girls that wanted to "jump" her, and it made her particularly nervous that a group of people showed up at her house wanting to fight her. Ex. 102, at 2 min., 11 sec.

experience, and police conduct." *State v. Aten*, 130 Wn.2d 640, 664, 927 P.2d 210 (1996). Courts look to the totality of the circumstances to determine whether a statement is voluntary. *Id*. at 663-64.

"We will not disturb a trial court's conclusion that a waiver was voluntarily made if the trial court found, by a preponderance of the evidence, that the statements were voluntary and substantial evidence in the record supports the finding." *Athan*, 160 Wn.2d at 380. Evidence is substantial if the record contains a sufficient quantity of evidence to persuade a fair-minded, rational person of the truth of the assertion. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

*2. RCW 13.40.740*

RCW 13.40.740 took effect in January 2022. The statute addresses access to attorneys for juveniles. The statute provides that children cannot knowingly, intelligently, and voluntarily waive their *Miranda* rights until they have consulted with an attorney. RCW 13.40.740(3)(a).

B. Application

Luna makes two arguments about why the trial court should have excluded the custodial statements she made to the police.

First, she contends that she did not knowingly, intelligently, and voluntarily waive her Fifth Amendment rights because the trial court did not consider her "age, lack of experience with the police, the trauma she had endured minutes earlier, [and] her complaints of head injuries." Br. of Appellant at 65. Luna argues that had the trial court considered those factors, it would not have found a proper waiver under the totality of the circumstances.

The State, in its response, notes that Luna "superficially argues" that nine of the trial courts findings of fact on the CrR 3.5 hearing are not supported by substantial evidence. Br. of Resp't at

52. The State is correct on this point, because Luna, in an unserious nod to RAP 10.3 merely states, in a parenthetical in the argument section of her brief, that findings of fact VIII, XV, XVI, XVII, XXIV, XXVII, XXVIII, XXIX, and XXX are not supported by substantial evidence.

Luna provides no argument, utilizing facts from the record, about why these findings of fact are allegedly unsupported by substantial evidence. This falls far short of the requirement in RAP 10.3(g) that "[a] separate assignment of error for each finding of fact a part contends was improperly made must be included with reference to the finding by number," and the requirement in RAP 10.3(a)(6) that an argument must be supported by references to relevant parts of the record. We decline to review Luna's challenges to the findings of fact and consider them to be verities on appeal. *State v. Eriksen*, 172 Wn.2d 506, 507 n.1, 259 P.3d 1079 (2011).

To the extent Luna argues that her age and her mental and physical trauma from the fight rendered her statements involuntary, the trial court found that Luna understood the rights that were read to her, that Luna was not in a coercive environment when her rights were read to her, and that Luna was capable of understanding and did not appear to be under the influence of any substances or suffering from any mental health issues at that time. Luna does not argue that the trial court erred in reaching these findings and she does not point to evidence in the record to show that these findings are not supported by substantial evidence. Luna also cites no case that holds that a suspect's age, standing alone, precludes a finding that their statements made to police after being properly advised of both their *Miranda* warnings and the additional juvenile advisement are involuntary.

We will not consider an argument on appeal if the grounds for that argument are not supported by citation to authority or adequate argument. *Cowiche Canyon Conservancy v. Bosley*,

118 Wn.2d 801, 809, 828 P.2d 549 (1992); *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992).

Second, Luna asserts that the legislature intended for RCW 13.40.740, the new statute on juvenile questioning that went into effect after Luna's custodial interview, to apply retroactively and, accordingly, we should conclude that her custodial statements are now inadmissible.

We review de novo whether a statute applies retroactively. *State v. Brake*, 15 Wn. App. 2d 740, 743, 476 P.3d 1094 (2020). RCW 10.01.040 provides, "No offense committed and no penalty or forfeiture incurred previous to the time when any statutory provision shall be repealed, whether such repeal be express or implied, shall be affected by such repeal, unless a contrary intention is expressly declared in the repealing act." To that end, "statutes generally apply prospectively from their effective date unless a contrary intent is indicated." *State v. Jefferson*, 192 Wn.2d 225, 245, 429 P.3d 467 (2018) (plurality opinion). Accordingly, "a statute in effect on the date of a criminal offense is the applicable statute 'absent clear legislative intent to the contrary.' " *Brake*, 15 Wn. App. 2d at 744 (quoting *In re Pers. Restraint of Flint*, 174 Wn.2d 539, 559 n.9, 277 P.3d 657 (2012) (Stephens, J., dissenting)).

Here, the legislature did not express a clear intent that RCW 13.40.740 should apply retroactively to juvenile interrogations that occurred before the statute went into effect. In her reply brief, Luna argues that

> Chapter 13.40 RCW evidences a legislative intent to provide children with the protections of 'due process' and respond and be accountable for their unique needs in the criminal justice system. RCW 13.40.010(2)(e). This policy, rooted in constitutional protections, should make RCW 13.40.740's bar on [Luna's] police interview inadmissible because it was in place when the trial occurred.

34

Reply Br. of Appellant at 27. But these arguments do not persuade us that the legislature intended for RCW 13.40.740 to apply to custodial interrogations that occurred before the statute went into effect.

Accordingly, we agree with the State and hold that the trial court did not err in finding that Luna knowingly waived her *Miranda* rights and admitting the custodial statements she made to Detective Garland.

### VIII. TESTIMONY TOUCHING ON LUNA'S VERACITY

Finally, as it relates to Luna's custodial statements, Luna argues Detective Garland should not have been permitted to offer an opinion about Luna's veracity. Our review of this claim is hampered by Luna's failure to identify the exact remarks she complains of. Her citation to 3 VRP at 710 suggests that she is referring to the questions *her own attorney* posed to Garland:

> [Mr. Kannin:] You saw the video; right?
> [Det. Garland:] I was there during the video.
> [Mr. Kannin:] And she was cooperating with you?
> [Det. Garland:] Absolutely.
> [Mr. Kannin:] Telling the truth to you?
> [Det. Garland:] I think that's up for discussion.
>  . . . .
> [Mr. Kannin:] Are you saying she's lying about this?
> [Det. Garland:] Yes. I think she was lying about this. I think that she told me things
>        in there that were clearly lies. After I observed the video you pointed out,
>        I'd already seen --
> [Mr. Kannin:] Yeah.
> [Det. Garland:] -- there was clearly things that she told me in there that were not
>        truthful.
> [Mr. Kannin:] Okay. So now you're being critical of her because what? Because
>        she didn't know whether the knife was folded or unfolded?
>              And clearly -- I mean, we have the video, and she admits that she
>        had the knife, took it out, and then the only time she stabbed at the other girl
>        is after she got socked in the head; isn't that right?
> [Det. Garland:] You asked me if she was being truthful when I interviewed her, and
>        I'm telling you that she was not. That's the question I was answering.

[Mr. Kannin:] Okay. Well, that's your opinion. You're saying it's about the knife, that somehow she didn't tell you the truth about the knife; is that what it is?

[Det. Garland:] I'm telling you that she didn't tell me the truth about the knife, yes. I'm also telling you that she gave me several different stories, that not all of them could have been truthful. It's just not possible.

3 VRP at 709-10.

Luna frames this issue as *trial court error* in admitting this testimony, ignoring that this testimony was given in direct response to Luna's own questioning. This error was plainly invited. The invited error doctrine prohibits " 'a party from setting up an error at trial and then complaining of it on appeal.' " *City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002) (quoting *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995)). If "a party takes an affirmative and voluntary action that induces the trial court to take an action that a party later challenges on appeal," the doctrine applies. *Casper v. Esteb Enters., Inc.*, 119 Wn. App. 759, 771, 82 P.3d 1223 (2004). Invited error prevents review of instructional errors even if they are of constitutional magnitude. *Patu*, 147 Wn.2d at 720.

To the extent that Luna implicitly suggests that a trial court should intervene when a defendant's lawyer asks questions that, *if asked by the State*, would be flatly improper and inadmissible, Luna cites no authority for that novel proposition. Defense counsel's strategic decisions should be afforded wide latitude. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). It is not the role of the trial court to interfere in tactical decisions made by a defendant and

36

their counsel.[15] Luna's claim of error fails, both under the invited error doctrine and because Luna fails to apprise us of the exact statements on which her claim is based.

## IX. ANY ERRORS MADE BY THE TRIAL COURT WERE HARMLESS AND DID NOT DEPRIVE LUNA OF A FAIR TRIAL

Luna argues that each of the errors outlined above prejudiced her, but "to the extent there is any doubt, reversal is warranted under the cumulative error doctrine" because "the accumulation of errors discussed above is of sufficient magnitude that reversal is necessary." Br. of Appellant at 77-78. We disagree.

A. Legal Principles

"Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant [their] right to a fair trial, even if each error standing alone would be harmless." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). "The doctrine does not apply where the errors are few and have little or no effect on the trial's outcome." *Id*.

B. Application

The only claim of error Luna makes for which we have found merit is her claim that the trial court should not have admitted "the Purge video" and the "stabbing energy" comment on social media. But these errors were harmless and relatively minor in light of the evidence as a whole. Luna did not deny that she stabbed SPT, and the primary issues to be decided by the jury

---

[15] With respect to Luna's citation to pages 1447-54 of the trial record, this portion of the record contains Detective Garland's rebuttal testimony. Luna does not advise us which statement in this portion of Garland's testimony she is challenging. We are not inclined to guess which statement Luna complains of in this eight-page span of the transcript. *See Multicare v. Dep't of Soc. & Health Servs*., 173 Wn. App. 289, 299, 294 P.3d 768 (2013).

were whether she acted with premeditation (the jury found she did not and acquitted her of first degree murder), and whether she killed SPT in self-defense.

The evidence presented by the State that Luna did not act in self-defense was substantial, if not overwhelming. Luna could have declined to give HD her address prior to the stabbing. She also could have declined to come outside and meet SPT, and she could have called the police for help. Although the jury was instructed that Luna had no duty to retreat, she also had no obligation to actively engage SPT, whom she knew to be unarmed. Moreover, Luna's stepfather and boyfriend were both present at the fight and Luna's boyfriend recorded it. Luna's actions belie her claim that she feared harm from SPT. The jury could reasonably infer from the evidence that Luna was eager for a fight and had enlisted her boyfriend to record it so that she could post it on social media.

Luna is not entitled to relief under the cumulative error doctrine.[16]

---

[16] Luna's final assignment of error is that if we were to conclude that of any of her claims of error were invited or not preserved, then she suffered ineffective assistance of counsel. Luna fails to identify any specific act or omission of counsel that she claims fell below the standard of care, and she fails to demonstrate that the outcome of her trial probably would have been different but for counsel's unprofessional errors. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). She provides no argument on this claim, and seemingly expects us to comb the record in search of deficient performance on the part of counsel and to speculate, without benefit of argument, that she suffered prejudice. We decline this invitation. An assignment of error containing nothing but boilerplate citations to the law and devoid of argument or citations to the record does not warrant our consideration. *Cowiche Canyon*, 118 Wn.2d at 809.

No. 57943-0-II

## CONCLUSION

Finding no reversible error, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

LEE, J.

CHE, J.